**In re GRAND JURY SUBPOENA SERVED UPON John DOE, Esq.**

**Richard ROE, Intervenor-Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 638, Docket 84–6319.**

United States Court of Appeals, Second Circuit.

Originally Argued Before Panel Dec. 13, 1984; Decided April 1, 1985.

Petition for Rehearing Submitted to Panel May 24, 1985; Decided June 13, 1985.

Petition for Rehearing En Banc Submitted to En Banc Court Sept. 6, 1985; Argued Oct. 3, 1985; Decided Jan. 9, 1986.

Applications for stays pending certiorari denied by Justice Marshall on Feb. 18, 1986 and by Justice Brennan on Feb. 24, 1986.

Certiorari Denied April 7, 1986.

Ronald E. DePetris, Asst. U.S. Atty., Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty., L. Kevin Sheridan and Mary McGowan Davis, Asst. U.S. Attys., Brooklyn, N.Y.; Edward A. McDonald, Attorney-in-Charge, U.S. Dept. of Justice, Organized Crime Strike Force, E.D.N.Y., Brooklyn, N.Y.; Michael A. Guadagno, Sp. Atty., Organized Crime Strike Force, Brooklyn, N.Y., on the brief) for the United States, appellee.

Mark M. Baker, New York City (John H. Jacobs, New York City, on the brief) for intervenor-appellant.

Richard Emery and Ann Detiere, New York City, submitted a brief for New York Civil Liberties Union, amicus curiae.

Herman Kaufman and Austin V. Campriello, New York City, submitted a brief for New York Criminal Bar Ass'n, amicus curiae.

George H. Newman, Philadelphia, Pa., for Nat. Ass'n of Criminal Defense Lawyers and New Jersey Ass'n of Criminal Defense Lawyers, submitted a joint brief amicus curiae.

Gerald B. Lefcourt and John H. Doyle, III, New York City, for Ass'n of the Bar of the City of New York; and Mordecai Rosenfeld, New York City, for New York County Lawyers Ass'n, submitted a joint brief amicus curiae.

Before FEINBERG, Chief Judge, OAKES, TIMBERS, MESKILL, NEWMAN, KEARSE, CARDAMONE, PIERCE, WINTER, PRATT and MINER, Circuit Judges.[*]

TIMBERS, Senior Circuit Judge (with whom OAKES, MESKILL, NEWMAN, KEARSE, PIERCE, WINTER, PRATT and MINER, Circuit Judges, concur):

We have before us for en banc reconsideration an appeal from an order entered October 22, 1984 in the Eastern District of New York, Eugene H. Nickerson, District Judge, which denied a motion to quash a grand jury subpoena duces tecum.

A panel of this Court on April 1, 1985, by a divided vote, 759 F.2d 968, reversed the order of the district court and remanded the case for further proceedings.

For the reasons set forth below, we vacate the judgment and opinion of the panel and we affirm the order of the district court.

## I. FACTS AND PRIOR PROCEEDINGS

A grand jury in the Eastern District of New York is investigating the activities of the Colombo organized crime family and a faction of that enterprise known as the "Anthony Colombo crew". Under investigation are a number of serious offenses, including murder, racketeering, narcotics trafficking, robbery, gambling, extortion, interstate transportation of stolen property and other federal crimes. On September 5, 1984, in connection with this ongoing investigation, a subpoena duces tecum was served on Barry I. Slotnick, attorney for Anthony Colombo, intervenor-appellant. The subpoena commanded Slotnick to appear before the grand jury and to produce:

"any and all records of fees, monies, property or other things of value received, accepted, transferred or held by BARRY SLOTNICK or by any associate of BARRY SLOTNICK on his behalf, from, on account of, or on behalf of

[twenty-one named individuals including Anthony Colombo].
These records are to include, but not be limited to, records of fees, monies, property or other things of value received, accepted, transferred to or held by BARRY SLOTNICK or by any associate of BARRY SLOTNICK on his behalf in connection with [nine enumerated criminal proceedings]."

The grand jury seeks to determine whether Colombo paid for, or otherwise arranged for, the legal representation of members of his crew. Evidence of such benefactor payments made to Slotnick might establish Colombo as the head of "an enterprise", as that term is defined in the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961(4) (1982).

At oral argument before this en banc court, the government stated that the subpoena duces tecum, although admittedly broad on its face, will be limited specifically to benefactor payments made by Colombo on behalf of his "crew" members. The subpoena, according to the government, will not encompass Colombo's payments to Slotnick for his own representation in the past, nor for Colombo's representation in connection with other outstanding indictments. Thus, the scope of the subpoena is limited to the government's inquiry as to a possible RICO violation.

Slotnick moved to quash the grand jury subpoena pursuant to Fed.R.Crim.P. 17(c), asserting that the government had failed to establish the relevance of, or need for, the information. Judge Nickerson denied the motion to quash. Colombo was granted intervenor status to appeal. In a 2–1 decision, a panel of this Court reversed the district court.

Subsequent to the panel decision, Colombo and members of his crew were indicted on charges of conspiracy to violate the narcotics laws, 21 U.S.C. § 846 (1982); engaging in a continuing criminal enterprise, 21 U.S.C. § 848 (1982); participating in multiple violations of the Hobbs and Travel Acts, 18 U.S.C. §§ 1951, 1952 (1982); and

---

[*] Circuit Judges Kaufman and Altimari have elected not to participate in this en banc appeal.

transporting stolen property interstate, 18 U.S.C. § 2314 (1982). Colombo was not indicted for the RICO violation in connection with which the grand jury seeks the information called for in the subpoena duces tecum.

Colombo claims that the appearance and testimony before a grand jury of his attorney, Slotnick, who has represented Colombo for nearly eighteen years, will lead, *inevitably*, to the disqualification of the attorney. A grand jury appearance, according to Colombo, would undermine this long-established relationship of confidence between Colombo and Slotnick. Thus, Colombo claims that his Sixth Amendment rights are implicated; and that, absent the government's demonstration of need for the information and that the attorney is the only source of that information, the subpoena should be quashed. Colombo also claims that, since he now has been indicted on some criminal charges and his Sixth Amendment rights have attached as to them, the subpoena constitutes an impairment of such rights and an abuse of the grand jury process.

In the balance of this opinion, we shall address each of these claims asserted by Colombo. We shall discuss, first, the pre-indictment issue and, second, the post-indictment issue.

## II. PRE-INDICTMENT ISSUE

■ Turning to appellant's claims urged upon this en banc court, we shall focus first on the questions presented to the district court in October 1984, *i.e.*, during the pre-indictment period. The question as to whether the district court abused its discretion in denying the motion to quash the subpoena prior to indictment is not moot. Whether the government must establish a need for the information, in addition to its relevance, before a subpoena served on the attorney for an unindicted target of a grand jury investigation can be enforced, is a question that is "capable of repetition yet evades review". *See In Re Special April 1977 Grand Jury*, 581 F.2d 589, 591 (7 Cir.), *cert. denied*, 439 U.S. 1046 (1978);

*In Re Grand Jury Proceedings (Freeman)*, 708 F.2d 1571, 1573 (1 Cir.1983). Grand jury investigations must proceed expeditiously. The length of time required for appellate review often is protracted. Frequently indictments will be returned before the appellate process is completed, as occurred here. The instant subpoena was served on Slotnick on September 5, 1984, more than a year ago.

Colombo asserts that compliance with the subpoena will chill the relationship between his attorney and himself and thus violate his Sixth Amendment right to assistance of counsel and his Fifth Amendment due process rights. Colombo therefore argues that, before this subpoena can be enforced, the government must demonstrate both a compelling or reasonable need for the information regarding benefactor payments and that his attorney is the only source of that information. Colombo contends that the traditional standard of relevance, see *In Re Liberatore*, 574 F.2d 78, 82–83 (2 Cir.1978), is not adequate to protect his "implicated" right to counsel. Colombo further contends that Fed.R.Crim.P. 17(c), which empowers a district court to quash a subpoena where "compliance would be unreasonable or oppressive", is not sufficient protection.

For the reasons stated below, we find Colombo's essential claims referred to above to be without merit. We decline to impose upon the government the additional requirement that it demonstrate a need for the information. At the pre-indictment stage, appellant's Sixth Amendment rights have not attached; nor at that stage, absent interrogation of a custodial target himself, are there additional rights grounded in the due process clauses. The fee information which the government seeks is not privileged. The appropriate time to balance the interests of the government and Colombo's right to counsel is at the pretrial stage, not at the grand jury stage.

### A.

■ There is no constitutional basis for imposing additional requirements for the

government to meet before the grand jury subpoena can be enforced in this case. The Sixth Amendment does not require a preliminary showing of need before enforcing a grand jury subpoena served upon an attorney whose client is an unindicted target of a grand jury investigation.

The Sixth Amendment provides in part that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. At the time the district court denied Colombo's motion to quash the subpoena, he had not been indicted. Since Sixth Amendment rights do not attach until "the time that adversary judicial proceedings have been initiated", *Kirby v. Illinois*, 406 U.S. 682, 688 (1972) (plurality opinion), Colombo could not assert a violation of his Sixth Amendment rights at the time of the district court's ruling.

In *Kirby*, the Court refused to "import into a routine police investigation an absolute constitutional guarantee historically and rationally applicable only *after* the onset of formal prosecutorial proceedings." *Id.* at 690 (emphasis added). The Court explained that

> "[t]he initiation of judicial criminal proceedings is far from a mere formalism. It is the starting point of our whole system of adversary criminal justice. For it is only then that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law. It is this point, therefore, that marks the commencement of the 'criminal prosecutions' to which alone the explicit guarantees of the Sixth Amendment are applicable."

*Id.* at 689–90.

We have followed the Supreme Court in holding that "[a] person comes under the protection of the sixth and fourteenth amendment right to counsel from the moment judicial proceedings are initiated against him, 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *Carvey v. LeFevre*, 611 F.2d 19, 21 (2 Cir.1979), *cert. denied*, 446 U.S. 921 (1980), *quoting Kirby v. Illinois, supra*, 406 U.S. at 689; *see also United States v. Mohabir*, 624 F.2d 1140, 1149 (2 Cir.1980) ("'[A]fter prosecution has begun, the right to obtain the assistance of counsel at all crucial stages is essential if both the symbol and reality of a fair trial are to be preserved....'"). We have further held that, during the grand jury investigation of an unindicted target, the Sixth Amendment right to counsel does not attach. *United States v. Vasquez*, 675 F.2d 16, 17 (2 Cir.1982) (per curiam); *see also United States v. Mandujano*, 425 U.S. 564, 581 (1976) (plurality opinion; dictum); *In Re Groban*, 352 U.S. 330, 333 (1957) (dictum). Since adversary judicial proceedings had not been initiated against Colombo at the time of the entry of the district court order under review, his Sixth Amendment right to counsel had not attached, absent Colombo's interrogation as a suspect in custody, *Miranda v. Arizona*, 384 U.S. 436, 475 (1966). His interest in continuing to be represented by his present counsel was not of constitutional dimensions.

The Supreme Court has made clear that, when a grand jury subpoena does not infringe upon a constitutionally protected interest, there is no reason to require a preliminary showing before allowing the government to enforce the subpoena. *United States v. Dionisio*, 410 U.S. 1, 16 (1973). Since Colombo's Sixth Amendment right to counsel has not attached, there is no merit to his contention that the Constitution requires any greater showing to be made in order to enforce this grand jury subpoena than to enforce any other.

Throughout his challenge to enforcement of the instant subpoena, Colombo has insisted that, even if his Sixth Amendment rights have not attached, his attorney's appearance before the grand jury will chill his *potential* Sixth Amendment rights, that the relationship between Colombo and Slot-

nick will be undermined irreparably, and that Slotnick will be disqualified from representing Colombo. He argues that to call his attorney before the grand jury is to set the stage for the attorney's forced withdrawal.[1] The Model Code of Professional Responsibility states:

"If, after undertaking employment in a contemplated or pending litigation, a lawyer believes or it is obvious that he or a lawyer in his firm may be called as a witness other than on behalf of his client, he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client."

Model Code of Professional Responsibility DR 5–102(B) (1979); Model Rules of Professional Conduct, Rule 3.7. Even assuming that this rule is intended to encompass grand jury testimony as well as trial testimony, Colombo's argument assumes too much. We decline to adopt what amounts to a *per se* rule that testimony of an attorney before a grand jury as to benefactor payments inevitably will lead to disqualification of that attorney from representing his client.

Before disqualification can even be contemplated, the attorney's testimony must incriminate his client; the grand jury must indict; the government must go forward with the prosecution of the indictment; and ultimately, the attorney must be advised that he will be called as a trial witness against his client. As a court, we decline to speculate that all those events will occur. Apparently Colombo ignores the possibility that his attorney's grand jury testimony may be exculpatory or neutral, or that the government may decide not to use such information at trial, or that the information may be presented at trial in such a way that the attorney can avoid testifying,[2] or that the trial judge may rule *in limine* that the information is not admissible, perhaps because its probative force does not justify a resulting disqualification of counsel.[3] Disqualification of counsel is not inevitable.

We hold that Colombo's Sixth Amendment rights will not be violated by enforcement of this subpoena.

Colombo's second constitutional challenge to the subpoena is a vague assertion that requiring his attorney to testify as to fee information somehow implicates his

---

**1.** The government, in its argument before the district court, stated: "[W]e realize Mr. Slotnick would probably be conflicted out if he gave testimony to the Grand Jury that was useful." Colombo has seized upon this statement to bolster his argument that disqualification is inevitable. We do not interpret this statement of the government as a concession that Slotnick would be disqualified. Not only are there numerous contingencies involved in disqualification of counsel, but the disqualification issue is not one for the government to determine. It is an issue for the courts. *See* Model Rules of Professional Conduct, Rule 3.7.

Appellant also points to the Department of Justice Guidelines which suggest that "[a]ll reasonable attempts shall be made to obtain information from alternative sources before issuing a subpoena to an attorney relating to the representation of a client...." That the government does not issue such subpoenas at whim is hardly a concession that the government also believes that a heightened showing, assessed by the courts, is *required* before an attorney may be called to appear before the grand jury.

**2.** It may be possible, for example, to introduce the evidence by a stipulation. Moreover, the

Canons of Ethics permit a lawyer to testify while representing a client in four instances:

"(1) If the testimony will relate solely to an uncontested matter.
(2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.
(3) If the testimony will relate solely to the nature and value of legal services rendered in the case by a lawyer or his firm to the client.
(4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case."

Model Code of Professional Responsibility, DR 5–101(B).

**3.** We note that this case involves information which is peculiar to only one attorney. Colombo is not in a situation where, even if the information was ruled admissible, a snowball effect would deprive him of retained counsel entirely. *See, e.g., United States v. Badalamenti,* 614 F.Supp. 194, 197–98 (S.D.N.Y.1985) (potential loss of attorney's fees under forfeiture provisions of RICO presents problem of retaining *any* lawyer).

Fifth Amendment due process rights. The claim is without merit.

▮ We hold that the Fifth Amendment does not require a preliminary showing of need prior to enforcement of a grand jury subpoena served on counsel for an unindicted target of a grand jury investigation. The due process clause provides no greater opportunity for Colombo to halt the grand jury investigation than does the Sixth Amendment.

▮ The Sixth Amendment right to assistance of counsel is "of such a character that it cannot be denied without violating those 'fundamental principles of liberty and justice which lie at the base of all our civil and political institutions' ", *Powell v. Alabama*, 287 U.S. 45, 67 (1932), *quoting Hebert v. Louisiana*, 272 U.S. 312, 316 (1926), and therefore necessarily is included in the concept of due process of law. *Powell v. Alabama, supra; Gideon v. Wainwright,* 372 U.S. 335 (1963). *Powell v. Alabama* and *Gideon v. Wainwright* made the Sixth Amendment right to counsel applicable to the states through the due process clause of the Fourteenth Amendment. While violations of an accused's right to counsel are encompassed within the concept of due process, the due process clauses neither expand nor contract the constitutional protection provided by the Sixth Amendment right to counsel.

A close examination of the cases discloses that even if there were no Sixth Amendment, historically the Fifth Amendment due process clause would protect that right. *See* Oakes, *The Proper Role of the Federal Courts in Enforcing the Bill of Rights,* 54 N.Y.U. L. Rev. 911, 919–23 (1979):

"The interrelationship of the enumerated rights is significant for several reasons. The Bill cannot be construed merely taxonomically, as a set of pigeonholes or preconceived rules into which a given factual situation does or does not fit. Rather it must be viewed as a whole; it is an interlocking complex of basic principles of fairness and individual entitlement that carries a continuing

meaning applicable to entirely different or changed circumstances."

*Id.* at 922. In *United States v. Flanagan,* 679 F.2d 1072, 1075 (3 Cir.1982), *rev'd on other grounds,* 465 U.S. 259 (1984), the court indicated that a defendant's decision to select a particular attorney is afforded some protection by the Sixth Amendment and by the due process clause of the Fifth Amendment, citing *Davis v. Stamler,* 650 F.2d 477, 479–80 (3 Cir.1981). Without any reference to the Fifth Amendment, the court in *Davis v. Stamler* stated that "[t]he right to counsel of one's choice also derives from the due process clause", *id.* at 480, citing *United States ex rel. Carey v. Rundle,* 409 F.2d 1210 (3 Cir.1969), *cert. denied,* 397 U.S. 946 (1970). *Carey* held that the Sixth and Fourteenth Amendments require that an accused be afforded a fair and reasonable opportunity to obtain counsel of his choice. *Id.* at 1211, 1215. Presumably, the court in *Davis v. Stamler* also was referring to the due process clause of the Fourteenth Amendment since that case involved a state criminal defendant, and the court cited *Carey* as support for its statement. This, however, leaves *United States v. Flanagan* with no support for its proposition that the due process clause of the *Fifth* Amendment protects a defendant's decision to retain particular counsel. The cases simply do not support the proposition that Colombo's due process rights under the Fifth Amendment are more expansive than the protection which the Sixth Amendment affords and therefore would require a greater showing before the government can enforce the subpoena. Even the Third Circuit cases cited above which do indicate that a defendant's decision to select a particular attorney is afforded protection by the Fifth as well as by the Sixth Amendment do not suggest that the Fifth Amendment protects a defendant's right to counsel more in either a qualitative or a quantitative sense than does the Sixth.

▮ We hold that there is no merit in Colombo's argument that calling an attorney for an unindicted grand jury target to testify before the grand jury will violate

his constitutional rights. Whether on constitutional grounds, or pursuant to our federal supervisory power,[4] we decline to impose an additional showing of need before the grand jury subpoena can be enforced under the circumstances of this case.

### B.

■ Aside from the absence of any constitutional basis for Colombo's position, there is no statutory or common law privilege protecting the information which the grand jury seeks to have disclosed. The government states that it seeks the information regarding fees and client identity as evidence of a criminal enterprise and Colombo's position as head of that enterprise. The government claims that evidence that Colombo, as "benefactor", paid for or otherwise arranged for legal representation for members of this criminal enterprise who were apprehended during the course of illegal activity would be relevant to determine whether Colombo should be indicted for his activities as head of a criminal enterprise.

■ We consistently have held that, absent special circumstances, client identity and fee information are not privileged. *E.g., In Re Shargel,* 742 F.2d 61, 62 (2 Cir.1984); *Colton v. United States,* 306 F.2d 633, 637–38 (2 Cir.1962), *cert. denied,* 371 U.S. 951 (1963); *United States v. Pape,* 144 F.2d 778, 782 (2 Cir.), *cert. denied,* 323 U.S. 752 (1944). *See also United States v. Hodge & Zweig,* 548 F.2d 1347, 1354 (9 Cir. 1977). "The goal of enabling attorneys to offer informed professional advice and advocacy cannot be accomplished if courts may compel disclosure of communications between the client and attorney necessary to the provision of such services." *In Re Shargel, supra,* 742 F.2d at 63. But where the communication is not confidential and is not necessary to obtain informed legal advice for the client, no privilege exists. *Fisher v. United States,* 425 U.S. 391, 403 (1976). While consultation with an attorney, and payment of a fee, may be neces-

---

**4.** Colombo relies on the reasoning in *In Re Special Grand Jury No. 81–1 (Leon D. Harvey),* 676 F.2d 1005 (4 Cir.), *vacated and withdrawn when grand jury indicted target and he became a fugitive,* 697 F.2d 112 (4 Cir.1982) (en banc), for the proposition that such a subpoena will "drive a wedge between the attorney and the client and the relationship will be destroyed," *id.* at 1009, and that the courts, under their supervisory powers, should prevent such abuses. We note that *Harvey* no longer has any precedential value even in the Fourth Circuit. Subsequent to *Harvey,* the Fourth Circuit, in an unpublished opinion by Judge Murnaghan, *United States v. Morchower,* No. 83–1816 (4 Cir. Sept. 28, 1983), explained the lack of precedential value of *Harvey:*

"The precedential value of the *Harvey* case was eliminated, however, when a majority of the circuit judges in regular active service ordered rehearing *en banc. See* 28 U.S.C. § 46(c), FRAP 35(a). Under the established practice of the Court, as a consequence, the panel decision was automatically vacated. Furthermore, the fact that Leon D. Harvey had, in the interim, (a) been indicted and (b) become a fugitive from justice led to an order withdrawing the panel opinions. *In re Special Grand Jury 81–1 (Leon D. Harvey),* 697 F.2d 112 (4th Cir.1982)."

Slip op. at 3. The court explained further that

"... the granting of rehearing *en banc* [in *Harvey* ] was a demonstration of the presence

of a serious question in the mind of the Court as a whole as to the correctness of the opinion emanating from the panel majority."

Slip op. at 4. The court concluded that

"Since the facts of *Harvey* make it 'nearly identical' [to *Morchower* ] ..., causing it to present 'the precise question' [as in *Morchower* ] ..., and since we have concluded that the *Harvey* dissent has the better chance of prevailing, we apply the reasoning advanced in it and

AFFIRM."

Slip op. at 4–5. Judge Murnaghan was also the author of the dissent in *Harvey.* There he stated that

"... the grand jury should be free to subpoena without preliminarily, on a generalized basis, being required to justify the relevance and necessity of its action."

*Id.,* 676 F.2d at 1012 (footnote omitted).

With the elimination of any precedential value of the Fourth Circuit decision in *Harvey,* the position of Colombo in the instant case is fatally undermined. There no longer is any authority whatsoever to which he can point in support of his reliance upon the supervisory powers of a *court of appeals* over federal grand jury proceedings to justify requiring the government, prior to enforcing a subpoena served upon counsel for an unindicted target of a grand jury investigation, to establish need.

sary to obtain legal advice, their disclosure does not inhibit the ordinary communication necessary for an attorney to act effectively, justly, and expeditiously. For this reason, absent special circumstances not present here, disclosure of fee information and client identity is not privileged even though it might incriminate the client. *In Re Shargel, supra,* 742 F.2d at 63. Fee information may be sought as evidence of unexplained wealth which may have been derived from criminal activity, and information that fees were paid either by other clients or by third persons may be sought to determine the identity of a benefactor. *Id.* at 63–64. As a general rule, and specifically in this case, such information is not protected from disclosure by the attorney-client privilege.[5]

◼ Moreover, at the time a benefactor offers an attorney payment for the legal representation of others, the attorney should be aware that fee information is not privileged and, indeed, should explain to his client that a potential conflict may arise. Aware of the potential conflict at this initial stage of communication, the attorney and client later should not be heard to complain that disclosure of benefactor payments might chill their relationship of trust. This is a self-imposed problem that very well could have been avoided.[6]

### C.

To impose additional requirements that the government show its need for the information sought and that the attorney is the only source for that information would hamper severely the investigative function of the grand jury, if not stop the grand jury "dead in its tracks". *See In the Matter of Klein,* 776 F.2d 628 (7 Cir.1985). To create new standards for obtaining fee information at the grand jury stage risks unacceptable interruption of the grand jury process and inevitable probing into what information the grand jury already has in order to determine whether a heightened "need" standard has been met. To allow a grand jury target to challenge the subpoena on the basis of a "need" requirement would seriously jeopardize the secrecy of the proceeding and the grand jury's investigative functions.

◼ The courts have long recognized the importance of expeditious grand jury proceedings. "The grand jury is an integral part of our constitutional heritage which was brought to this country with the common law." *United States v. Mandujano, supra,* 425 U.S. at 571. Historically, it has been viewed as "a basic guarantee of individual liberty", and it "continues to function as a barrier to reckless or unfounded charges." *Id.* Grand jury proceedings serve not only the investigative function of determining whether an indictment should be returned, but also the protective function of securing persons "against arbitrary or oppressive action, by insuring that serious criminal accusations will be brought only upon the considered judgment of a representative body of citizens acting under oath and under judicial instruction and guidance." *Id.*

◼ The investigative powers of the grand jury necessarily are broad so that it may carry out adequately its task of deter-

---

5. *But see* Note, *Benefactor Defense Before the Grand Jury: The Legal Advice and Incrimination Theories of the Attorney-Client Privilege,* 6 Cardozo L.Rev. 537 (1985) (suggesting that benefactor identity and fee arrangements should be privileged); and *see generally Developments In The Law—Privileged Communications,* 98 Harv. L.Rev. 1451, 1501–09, 1514–24, 1522 & n. 124 (1985).

6. If in fact Slotnick accepted benefactor payments, he should have heeded the warning of the Model Code of Professional Responsibility against accepting payment of clients' fees from a third party. DR 5–107(A), EC 5–21, 5–22. Accepting payment of clients' fees from a third party may subject an attorney to undesirable outside influence, particularly where the attorney is representing clients in criminal matters, Model Rules of Professional Conduct, Rule 1.7, and the third party is the head of a criminal enterprise of which the clients are members. In such a situation, an ethical question arises as to whether the attorney's loyalties are with the client or the payor. *See* Judd, *Conflicts of Interest—A Trial Judge's Notes,* 44 Fordham L.Rev. 1097, 1099–1101, 1105 n. 41 (1976).

mining the existence of criminal activity and returning well-founded indictments. *Branzburg v. Hayes*, 408 U.S. 665, 688 (1972). The grand jury is authorized to subpoena witnesses and to require the production of evidence.

"Although the powers of the grand jury are not unlimited and are subject to the supervision of a judge, the longstanding principle that 'the public ... has a right to every man's evidence,' except for those persons protected by a constitutional, common-law, or statutory privilege, is particularly applicable to grand jury proceedings."

*Id.* at 688 (citations omitted). Every person within the jurisdiction of the government has an obligation to appear and give his evidence before the grand jury. *United States v. Dionisio, supra*, 410 U.S. at 9–10.

"A grand jury's investigation is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed...." *United States v. Stone*, 429 F.2d 138, 140 (2 Cir. 1970). It is part of the grand jury's function of protecting persons against arbitrary or unfair action to call before it persons suspected of criminal activity and "persons suspected of no misconduct but who may be able to provide links in a chain of evidence relating to criminal conduct of others". *United States v. Mandujano, supra*, 425 U.S. at 573. "It is entirely appropriate—indeed imperative—to summon individuals who may be able to illuminate the shadowy precincts of corruption and crime." *Id.* Attorneys are not exempted from this duty to appear before this investigative body.

A new requirement to be complied with by the government before it may enforce a grand jury subpoena served upon an attorney can be justified only if the information sought is protected by a constitutional, common law, or statutory privilege. *See Branzburg v. Hayes, supra*, 408 U.S. at 688.

"Any holding that would saddle a grand jury with minitrials and preliminary showings would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws. The grand jury may not always serve its historic role as a protective bulwark standing solidly between the ordinary citizen and an over-zealous prosecutor, but if it is even to approach the proper performance of its constitutional mission, it must be free to pursue its investigations unhindered by external influence or supervision so long as it does not trench upon the legitimate rights of any witness called before it."

*United States v. Dionisio, supra*, 410 U.S. at 17–18 (citations omitted). Where, as here, neither an attorney-witness nor a client-intervenor raises a valid constitutional claim or statutory privilege, "there is no more reason to require a preliminary showing ... than there would be in the case of any witness who, despite the lack of any constitutional or statutory privilege, declined to answer a question or comply with a grand jury request." *Id.* at 16. Such interference with grand jury proceedings is not justified by the Constitution or case law. Moreover, the Supreme Court has noted with disapproval the delays caused by requiring the government to make a preliminary showing of need, and unavailability of other sources, before it can enforce a grand jury subpoena. *Id.* at 17 n. 16.

Even where constitutional rights are involved, the Supreme Court has been reluctant to create constitutional exemptions to the duty to appear before a grand jury and furnish relevant information, or to require preliminary showings to be made before persons claiming an infringement of their constitutional rights can be compelled to testify. *E.g., Branzburg v. Hayes, supra*, 408 U.S. at 690, 708.

We are sensitive to the need to prevent an arbitrary and unnecessary disqualification of an attorney. We hold, however, that the potentially competing in-

terests at stake concerning disqualification should be examined at the pretrial stage, not the grand jury stage. A district court, at the pretrial stage, can weigh the public interests—the probative value of the lawyer's testimony, the need to preserve ethical standards in the legal profession and the integrity of the judicial system—against the accused's right to counsel of his choice. Our decision today on the preindictment issue is supported by other courts which have examined that issue. *In the Matter of Klein, supra,* (rejecting imposition of "need" requirement before calling attorney to testify before grand jury); *In Re Grand Jury Proceedings (Weiner),* 754 F.2d 154, 156 (6 Cir.1985) ("Precedent does not support Doe's assertion that the government must make a showing of need in order to direct a subpoena to an attorney."); *In Re Grand Jury Proceedings (Freeman),* 708 F.2d 1571, 1575 (11 Cir. 1983) (rejecting limitation on grand jury power which "need" requirement would pose).[7]

## III. POST-INDICTMENT ISSUE

Having held that there is no constitutional right or statutory or common law privilege upon which Colombo can rely to impose a "need" requirement on the government at the pre-indictment stage, we turn to the effect of his subsequent indictment on the non-RICO counts. After the district court's denial of Colombo's motion to quash the subpoena served upon his attorney and after the filing of the panel opinion of our Court, Colombo was indicted on April 22, 1985 on several counts other than the RICO violation.[8] It is in connection with the RICO violation that the government seeks information relating to benefactor payments.

As a result of the indictment on the non-RICO counts, Colombo's Sixth Amendment rights have attached. *Kirby v. Illinois, supra,* 406 U.S. at 688. Colombo argues that, since some criminal proceedings against him have begun, his Sixth Amendment rights now require that the government show a compelling need for the benefactor payments information in order to enforce the subpoena. We disagree.

Although an indictment has been returned, the fee information which the government seeks still is not protected by any privilege. *In Re Shargel, supra,* 742 F.2d at 62.

With respect to Colombo's constitutional claims in the post-indictment context, the Sixth Amendment assures him the right to be free of unduly burdensome interruption of his counsel's trial preparation and protects him from any unnecessary or arbitrary disqualification of his counsel. Assessment of whether the subpoena is unreasonable or burdensome, especially when sought to be enforced against counsel for an indicted defendant, can be determined under the standards of Rule 17(c), informed by Sixth Amendment considerations. The risk of disqualification should remain for determination at an *in limine* hearing by the trial judge who must weigh the probative value of the information the government seeks against the loss of counsel of the accused's choice.

The right to retain counsel of one's choice, however, is not absolute. It "must give way when required by the fair and proper administration of justice." *United States v. Ostrer,* 597 F.2d 337, 341 (2 Cir.1979). While involuntary disqualifi-

---

**7.** The Supreme Judicial Court of Massachusetts has taken a different approach to this issue. *New Rule Set on Lawyer Subpoenas,* Nat'l L.J., Nov. 4, 1985, at 3, 42. In October 1985 that court adopted a new disciplinary rule which makes it "unprofessional conduct" for a prosecutor to issue a subpoena to a criminal defense attorney without obtaining prior judicial approval. We believe that in the federal courts Fed.R.Crim.P. 17(c), which shields all witnesses,

including attorneys, from "unreasonable or oppressive" abuses of grand jury proceedings, and the traditional standard of relevance of the information sought, *In Re Liberatore,* 574 F.2d 78, 82–83 (2 Cir.1978), provide sufficient safeguards.

**8.** *See United States v. Anthony Colombo,* 777 F.2d 96, 97 (2 Cir.1985).

cation of counsel may prevent an accused from retaining counsel of his choice, courts have the power and duty to disqualify counsel where the public interest in maintaining the integrity of the judicial system outweighs the accused's constitutional right. Criminal defendants have been constitutionally required to retain other counsel when "the need to preserve the highest ethical standards of professional responsibility" outweighs the accused's constitutional right, *United States v. Cunningham*, 672 F.2d 1064, 1070 (2 Cir.1982), *cert. denied*, 466 U.S. 951 (1984), and "where the inability of retained counsel to serve gives promise of unreasonable delay or inconvenience in completing the trial". *United States v. Cicale*, 691 F.2d 95, 106 (2 Cir. 1982), *cert. denied*, 460 U.S. 1082 (1983), *quoting United States v. Bentvena*, 319 F.2d 916, 936 (2 Cir.1963).

Having held that Rule 17(c) adequately protects the accused from unreasonable or oppressive demands upon his counsel, we could return the case to the district court for determination of the Rule 17(c) claim in light of the fact that an indictment has been returned and Sixth Amendment rights have attached. However, since the record before us is comprehensive and we are sufficiently informed to examine these competing interests, there is no need to cause further delays by remanding this issue to the district court.

■ Since September 5, 1984, more than a year ago, the government has been seeking information from Slotnick, the attorney involved in this case. The subpoena duces tecum seeks information relating to Colombo's payments for the legal representation of others. As we recognize in *In Re Shargel, supra*, 742 F.2d at 63, where we declined to create a testimonial privilege for fee information and client identity, denying grand jury access to this information "would create unnecessary but considerable temptations to use lawyers as conduits of information or of commodities necessary to criminal schemes or as launderers of money." Moreover, payment for legal representation may be a form of compensation

to members of a crime "crew". In the instant case, evidence of benefactor payments clearly is relevant to the grand jury's investigation of the Colombo crime family. The information sought is highly probative of the role of Colombo as head of that "enterprise", as that term is defined in RICO. 18 U.S.C. §§ 1961, 1962 (1982). Although the subject of the grand jury subpoena is engaged in representation of Colombo in connection with the present indictment, trial is not imminent, and there is no reason to anticipate that Slotnick's appearance at the grand jury for a limited inquiry will be time-consuming. Applying the standards of Rule 17(c), and finding the information which the government seeks highly probative of a RICO violation, we hold that in this case Colombo's Sixth Amendment interests do not outweigh the grand jury's need for this information.

■ Colombo also contends that the government's failure to indict him for a RICO violation constitutes an abuse of grand jury process, apparently on the theory that the government, by holding back the RICO violation, is endeavoring to use the subpoena to prepare for trial on the counts in the indictment. There is no evidence in the record to support this claim. The government has sought the information in question for more than fifteen months, long before the indictment. We do not agree with Colombo that the government is seeking this information to bolster its trial material on the present indictment. *Cf. In Re Grand Jury Subpoena Duces Tecum Dated January 2, 1985 (Simels)*, 767 F.2d 26 (2 Cir.1985) (timing of subpoena, first issued after indictment, suggested that its purpose was to obtain trial material). It was Colombo who caused the delays in this litigation by moving to quash the subpoena and appealing from the district court's order denying the motion to quash the subpoena. The government was faced with the statute of limitations running on some violations. The government was entitled to indict Colombo on those counts and await the completion of the grand jury

investigation before considering whether to indict him for RICO violations.

## IV.

To summarize:

In the pre-indictment context, Colombo has failed to establish that any constitutional rights or common law or statutory privileges require the government to demonstrate a need for information relating to benefactor payments. Such a requirement would unjustifiably impede the grand jury process. The pretrial stage, not the grand jury stage, is the appropriate time to balance Colombo's interest in his right to counsel against the public interest in obtaining benefactor payment information, should the issue of disqualification arise.

The subsequent indictment of Colombo on non-RICO counts is not a bar to requiring Slotnick to testify before the grand jury as to benefactor payments. We hold that the probative value of this information—information which may establish Colombo as head of a RICO enterprise—outweighs the Sixth Amendment rights which he asserts. And, as with the pre-indictment claim, the possibility of disqualification is not a basis for declining to enforce the subpoena; it is an issue for the trial judge if disqualification should arise. We find no evidence to support Colombo's claim that the government's decision not to seek indictment of him for RICO violations at the time of the return of the indictment on the non-RICO counts constitutes an abuse of the grand jury process.

We *vacate* the judgment and opinion of the panel entered April 1, 1985 and we *affirm* the order of the district court entered October 22, 1984.

## FEINBERG, Chief Judge (dissenting):

I respectfully dissent from the decision to affirm the district court's order denying the motion to quash the grand jury subpoena to attorney Slotnick. I agree with the conclusion reached by the majority in the panel decision, and by Judge Cardamone in his dissenting opinion in this rehearing in banc, that the subpoena should be quashed absent a government showing of need. However, I add a few additional observations, and, due primarily to the change in circumstances since the panel decision, I reach decision by a somewhat different route.

1. Assuming this appeal is not moot or in a posture so changed as to require remand, an issue discussed below, I believe that the district court should have quashed the subpoena for the reasons stated by the panel majority in *In re Grand Jury Subpoena Served on John Doe, Esq.*, 759 F.2d 968 (2d Cir.1985). The panel majority assumed that Sixth Amendment concerns came into play because the government conceded that Barry Slotnick, counsel for the target of the grand jury's investigation (Anthony Colombo), would be disqualified if he testified before the grand jury. 759 F.2d at 970. Government counsel told the district judge: "[W]e realize Mr. Slotnick would probably be conflicted out if he gave testimony to the Grand Jury that was useful. I think that he probably will...." The in banc majority, in its footnote 1, refuses to "interpret this statement of the government as a concession that Slotnick would be disqualified." I believe that the statement is such a concession and that, in any event, "probable" disqualification is enough to bring the Sixth Amendment into play. Furthermore, now that Colombo has been indicted on related offenses, it is obvious that Sixth Amendment considerations now apply, as the in banc majority opinion concedes in Part III of the opinion. Therefore, I do not address the question of what the rule should be, in the absence of the government's concession or the subsequent indictment, since that question was not before the district court and is not before us; if it were, I believe that a persuasive argument could be made for quashing the subpoena based upon the court's supervisory power, *United States v. Jacobs*, 531 F.2d 87 (2d Cir.), vacated, 429 U.S. 909, 97 S.Ct. 299, 50 L.Ed.2d 277 (1976), on remand, 547 F.2d 772 (2d Cir.1976), cert. dismissed, 436 U.S. 31, 98 S.Ct. 1873, 56 L.Ed.2d 53 (1978). Indeed, the situation contemplated in foot-

note 3 of the majority opinion, where obtaining an attorney's testimony would produce a "snowball effect" and deprive a defendant of *any* retained counsel, would seem to call for such an exercise of supervisory power.

2. The issue that *is* before us involves the clash between Colombo's obvious Sixth Amendment right to representation by counsel of his choice and the principle that no one is exempt from the duty to give evidence before a grand jury so that it can conduct a wide-ranging investigation of criminal activity. On this difficult question, the panel's analysis was fundamentally sound. It recognized the need to protect Sixth Amendment rights while not unduly infringing on the grand jury's investigative function. The compromise reached by the panel majority was sensible. It required the government to make a showing—in addition to mere relevance—that it needs the evidence. Indeed, as Judge Cardamone points out in his dissenting in banc opinion, the government apparently agrees that this is an appropriate standard. The Department of Justice Guidelines attached to the end of the government's brief to us state that "[a]ll reasonable attempts shall be made to obtain information *from alternative sources* before issuing a subpoena to an attorney relating to the representation of a client. . . ." (emphasis supplied), and provide that authorization shall be forthcoming from the Assistant Attorney General only where there are "reasonable grounds to believe that . . . the information sought is *reasonably needed* for the successful completion of the investigation or prosecution. The subpoena must not be used to obtain peripheral or speculative information." (emphasis supplied).

The burden on the government is not that unusual; as amici remind us, there is a similar burden on a party seeking information through subpoenas directed to members of the news media and in civil cases involving discovery of attorney's work product. See, e.g., *United States v. Burke*, 700 F.2d 70, 77 (2d Cir.1983) (media); *Hickman v. Taylor*, 329 U.S. 495, 510–12, 67 S.Ct. 385, 393–94, 91 L.Ed. 451 (1947) (work product). See also *Branzburg v. Hayes*, 408 U.S. 665, 709–10, 92 S.Ct. 2646, 2670–71, 33 L.Ed.2d 626 (1972) (Powell, J., concurring) (media). It seems obvious that a defendant's Sixth Amendment right is entitled to no less protection than a newspaper reporter's First Amendment right or an attorney's work product. In this case, although it claims that an important grand jury investigation is being hampered, the government made no attempt to satisfy the test laid down by the panel majority. To the contrary, it now appears that Slotnick's evidence is not necessary to enable the grand jury to indict; in its brief to us and at oral argument, the government indicates that the information is sought for the purpose of corroborating testimony and to obtain evidence useful at trial.

More fundamentally, however, the in banc majority opinion trivializes Sixth Amendment concerns. It bears repeating that "while the witness before us is a lawyer, the crucial interests at stake belong to the whole community." *In re Terkeltoub*, 256 F.Supp. 683, 684 (S.D.N.Y.1966). It is society, not simply the lawyer under subpoena or his indicted client, that " 'would feel the consequences' of a practice impairing the lawyer's effective representation of his client." *Id.*, quoting in part from *Hickman v. Taylor*, supra, 329 U.S. at 515, 67 S.Ct. at 395 (Jackson, J., concurring). Yet, under the majority's analysis, the government is not required to show any "need" for the information sought except that it is "highly probative." Majority op. p. 251. In other words, once the latter determination is made, the Sixth Amendment carries no weight at all. However, in this context, when Sixth Amendment concerns concededly apply and "the probative value of the information" sought is weighed "against the loss of counsel of the accused's choice," id. at 250, the government should have to show that the evidence, if unprivileged, cannot be obtained elsewhere, or can be obtained only with great difficulty, not simply that the evidence is "highly probative."

To require less erodes Sixth Amendment protections.

The in banc majority also dismisses Sixth Amendment concerns on the ground that "trial is not imminent," majority op. p. 251, doubtless relying on its earlier suggestion that the problem of disqualification can be worked out at a hearing closer to trial. The majority pays little, if any, attention to the immediate impact on the attorney-client relationship of having an indicted defendant's counsel testify before a grand jury against his will, beyond asserting that the appearance will not be "time-consuming." *Id.* Obviously, the uncertainty as to whether his chosen counsel will eventually be removed will affect both a defendant's readiness to rely upon counsel, see *In re Special Grand Jury No. 81-1* (Harvey), 676 F.2d 1005, 1009 & n.4 (4th Cir.), vacated and withdrawn when grand jury indicted target and he became fugitive, 697 F.2d 112 (4th Cir.1982) (in banc), and counsel's own ability to prepare for trial, since the subpoena will divert counsel's attention and energy at a time when he should be focusing solely on preparing for trial. See *In re Grand Jury Matters*, 751 F.2d 13, 18–19 (1st Cir.1984). The failure of the in banc majority opinion to discuss these considerations adequately makes clear how slight a weight it accords to Sixth Amendment rights in the ostensible weighing process.

3. Finally, the situation has changed so much since the district court (and then the panel) ruled, that the case should be remanded to the district court for reconsideration. In view of the pending indictments on related offenses against Colombo, can we say with assurance that the district judge would still refuse to quash the subpoena? I do not think that we can; moreover, as Judge Cardamone points out, the issue is properly for the district judge. In this sense, I believe that the issue originally presented on appeal has become moot and that, in any event, the case should be remanded for a ruling by the district judge.

CARDAMONE, Circuit Judge, dissenting:

The government's attack on the right to counsel of one's own choice in this case goes too far. Hypothesizing that perhaps some guilty members of organized crime evade justice because of their lawyers' astuteness, the government attempts to justify—on the grounds of expediency—subpoenaing defense counsel before a grand jury. We balance here the aim of law enforcement officials to present evidence before a grand jury against the right of a suspect target—in this case an unsavory Mafia figure—to have the attorney of his choice represent him in our adversary judicial system. At issue is not whether the government may subpoena a lawyer, but whether the prosecutor must first show a *need* for the lawyer's testimony before it subpoenas him. To forge ahead without a showing of need may rid society of some criminals, yet of greater concern is the fact that when the government deems it sufficiently expedient, perhaps other rights—established in long hard-fought legal battles—may now be jeopardized. Further, not requiring a demonstration of need will permanently damage the attorney-client relationship and produce the same net result as that gained by throwing the baby out with the bath water.

Because requiring defense counsel to appear before the grand jury without any showing of need violates the Sixth Amendment right to counsel in this case and the Fifth Amendment Due Process Clause in all cases, I respectfully dissent. Additionally, regardless of any constitutional considerations, for practical reasons applying specifically to this case, I believe the district court abused its discretion in not quashing this subpoena under its supervisory powers under Fed.R.Crim.P. 17(c).

### CONSTITUTIONAL ARGUMENTS

Before beginning an analysis of the Sixth and Fifth Amendments in this context, it is of help to discuss the historical function and power of the grand jury. That body's importance and the breadth of its investiga-

tive powers are deeply ingrained in our history. *United States v. Mandujano,* 425 U.S. 564, 571, 96 S.Ct. 1768, 1773, 48 L.Ed.2d 212 (1976). The Fifth Amendment guarantees that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on presentment or indictment of a Grand Jury...." Grand juries serve a dual function. They act as investigators weighing the sufficiency of evidence required for an indictment and as guardians of the public protecting it against arbitrary and oppressive government action. To accomplish its investigative function, the grand jury has been given broad power to compel the production of "every man's evidence". *United States v. Dionisio,* 410 U.S. 1, 9–10, 93 S.Ct. 764, 769, 35 L.Ed.2d 67 (1973); *see Branzburg v. Hayes,* 408 U.S. 665, 682, 92 S.Ct. 2646, 2657, 33 L.Ed.2d 626 (1972). But, its broad power is not limitless. It may not obtain evidence in violation of a valid privilege established under the Constitution, statute or common law *United States v. Calandra,* 414 U.S. 338, 346, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974). When a grand jury subpoena infringes either upon a constitutionally protected interest or a valid common law privilege, a reason exists to require a preliminary showing of need.

## I SIXTH AMENDMENT

### A. *Law Governing Sixth Amendment Right to Counsel*

The Sixth Amendment right to counsel has been a cornerstone of our judicial system since before the adoption of the federal Constitution and the Bill of Rights. *See Powell v. Alabama,* 287 U.S. 45, 61–64, 53 S.Ct. 55, 61–62, 77 L.Ed. 158 (1932). The right to counsel is of such critical importance to our adversary process that it cannot be denied without violating those fundamental liberties which form the base of our civil and political institutions. *Id.* at 67, 53 S.Ct. at 63 (*quoting Hebert v. Louisiana,* 272 U.S. 312, 316, 47 S.Ct. 103, 104, 71 L.Ed. 270 (1926)).

Provided the right has attached, a defendant is protected by the right to counsel whenever necessary to assure a meaningful defense, *see United States v. Wade,* 388 U.S. 218, 225, 87 S.Ct. 1926, 1931, 18 L.Ed.2d 1149 (1967), and its scope guarantees a defendant the right to be represented by counsel of his own choice. "It is hardly necessary to say that, the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice." *Powell,* 287 U.S. at 53, 63 S.Ct. at 58; *United States v. Curcio,* 694 F.2d 14, 22–23 (2d Cir.1982); *United States v. Flanagan,* 679 F.2d 1072, 1075 (3d Cir.1982), *rev'd on other grounds,* 465 U.S. 269, 104 S.Ct. 1051, 79 L.Ed.2d 288 (1984). The right to counsel of one's choice is of constitutional dimension and is "part and parcel of the right" to assistance of counsel expressly guaranteed. *Curcio,* 694 F.2d at 26.

The right is not absolute. It does not attach until adversarial judicial proceedings are commenced against a defendant, either by way of a formal charge, preliminary hearing, indictment, information, or arraignment. *Brewer v. Williams,* 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977). The fact that a person is the subject of a grand jury investigation is not sufficient to trigger his Sixth Amendment right to counsel. *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972); *United States v. Vasquez,* 675 F.2d 16, 17 (2d Cir.1982) (per curiam). Yet it prohibits the arbitrary disqualification or dismissal of a defendant's chosen attorney, and allows that defendant a fair opportunity to secure counsel of his choice. *Flanagan,* 679 F.2d at 1075; *Davis v. Stamler,* 650 F.2d 477 (3d Cir.1981); *United States v. Dolan,* 570 F.2d 1177 (3d Cir.1978). A defendant's right to choose his own counsel may not be obstructed unnecessarily. *See Davis,* 650 F.2d at 479.

### B. *Effect of Defendant's Indictment on Related Charges to his Right to Counsel on all Charges*

Colombo's intervening indictment on the non-RICO charges, subsequent to the panel's decision, has caused his Sixth Amend-

ment right to counsel now to attach, *Kirby,* 406 U.S. at 689–90, 92 S.Ct. at 1882, and that right may not be obstructed arbitrarily. When defense counsel is served with a subpoena after his client has been indicted, the government must make a showing of need that will justify the intrusion on the attorney-client relationship. In *United States v. Schwartzbaum,* 527 F.2d 249, 253 (2d Cir.1975), *cert. denied,* 424 U.S. 942, 96 S.Ct. 1410, 47 L.Ed.2d 348 (1976), we held that to call the government's counsel as a trial witness can be justified only by a showing of compelling and legitimate need.

The Supreme Court has just recently reasserted this principle in *Maine v. Moulton,* — U.S. ——, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985), by holding that once an accused's right to counsel has attached for one crime, that right cannot be violated even if the government is investigating a separate crime. To allow the government to do otherwise would cause a dilution of the protections guaranteed by the Sixth Amendment by limiting their scope.

> Once the right to counsel has attached and been asserted, the state must of course honor it (footnote omitted). This means more than simply that the state cannot prevent the accused from obtaining the assistance of counsel. The Sixth Amendment also imposes on the State an affirmative obligation to respect and preserve the accused's choice to seek this assistance. We have on several occasions been called upon to clarify the scope of the State's obligation in this regard, and have made clear that, at the very least, *the prosecutor* and police have *an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel.*

*Id.* at —— – ——, 106 S.Ct. at 484–85. (emphasis added).

In *Moulton* the defendant had been charged with automobile theft. He retained a lawyer and pleaded not guilty. Defendant met with his co-defendant, Colson, and allegedly suggested to Colson that the two kill the State's primary witness against them. Colson went to the police, confessed to the theft charge, and agreed to testify against defendant and act as a government informant. The police equipped Colson with a wire transmitter to record his next meeting with defendant, at which defendant made several incriminating statements. The Court suppressed the statements as made in violation of defendant's Sixth Amendment right to counsel. It held that the Sixth Amendment right to rely on counsel as a "medium" between a defendant and the government was violated by the state's knowing exploitation of an opportunity to confront the accused without counsel being present. The incriminating statements could not be used in a trial for auto theft, because defendant had been indicted on those charges when the statements were made, and his right to counsel had already attached.

> In seeking evidence pertaining to pending charges, however, the Government's investigative powers are limited by the Sixth Amendment rights of the accused. To allow the admission of evidence obtained from the accused in violation of his Sixth Amendment rights whenever the police assert an alternative, legitimate reason for their surveillance invites abuse by law enforcement personnel in the form of fabricated investigations and risks the evisceration of the Sixth Amendment right recognized in *Massiah.* . . . Consequently, incriminating statements pertaining to pending charges are inadmissible at the trial of those charges, notwithstanding the fact that the police were also investigating other crimes, if, in obtaining this evidence, the state violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel.

*Id.* at ——, 106 S.Ct. at 489.

The incriminating statements made by defendant could be admitted in a subsequent trial on his suggestion to murder a State's witness, since that charge was not pending when the statements were made,

and defendant therefore had no right to counsel as to an unindicted offense. *Id.*

Colombo has now been indicted for four related offenses. He has not been indicted on the RICO charge, which is also a related crime. His Sixth Amendment rights have therefore attached with regard to the pending charges. If attorney Slotnick is subpoenaed without a showing of need and subsequently disqualified, as a plain matter of common sense, he will be disqualified from representing his client for all purposes, including those offenses for which he has already been indicted. Thus, since defendant Colombo's Sixth Amendment rights to counsel have attached with regard to the four pending charges, the government's action in subpoenaing his lawyer on a related charge will deprive him of his choice of counsel to represent him for those indicted offenses without any showing of need. In this way defendant's Sixth Amendment rights are unconstitutionally diluted by the government's actions.

The government states that the subpoena was not served on attorney Slotnick to secure evidence for trial on the related charges and, it argues, because it had no pre-existing intent to impinge on Colombo's Sixth Amendment right to counsel, and did not use the grand jury for the dominant purpose of preparing an already pending indictment for trial, the intervening attachment of a constitutional right has no significance. *See United States v. Dardi,* 330 F.2d 316, 336 (2d Cir.), *cert. denied,* 379 U.S. 845, 85 S.Ct. 51, 13 L.Ed.2d 50 (1964). Concededly, a grand jury may legitimately continue an investigation of criminal conduct after returning an indictment on related offenses, even if the result of this procedure is to develop additional information about the crimes for which it has already indicted a defendant, *see United States v. Braasch,* 505 F.2d 139, 147 (7th Cir.1974), *cert. denied sub nom., Barry v. United States,* 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975). But when a defendant is arbitrarily deprived of counsel's representation for indicted offenses, then the Sixth Amendment has been violated. This conclusion is not altered by the fact that the government may have had an alternative, legitimate reason for following through with the subpoena and waiting to indict Colombo on the RICO charge.

The majority avoids this Sixth Amendment issue by itself finding a governmental need for fee information from attorney Slotnick and balancing it against the defendant's right to counsel, even though the government did not make this showing before the district court which, therefore, made no finding on the issue of need. The district court refused to quash this subpoena because Colombo had not been indicted, and the district judge believed defendant was not entitled to a governmental showing of need. Now that an indictment has been returned, a need showing is plainly required. It is not the role of *any* court to make a factual finding of need outweighing significant Sixth Amendment interests until the government meets its burden by placing into evidence some proof of need. And, it is plainly not an *appellate* court's function in any case to make these factual findings. The majority view violates Colombo's Sixth Amendment rights in this case.

## II FIFTH AMENDMENT

### A. *Due Process Right*

More significantly, the prosecution's failure to make a showing of need also violates Colombo's Fifth Amendment rights. One of the most fundamental guarantees of a fair trial protected by the due process clause is that an accused may not be convicted unless he has been accorded the right to the assistance of counsel. *See Powell,* 287 U.S. at 67–68, 53 S.Ct. at 63–64; *Johnson v. Zerbst,* 304 U.S. 458, 462–63, 58 S.Ct. 1019, 1022, 82 L.Ed. 1461 (1938); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). As discussed, the Sixth Amendment guarantees to criminal defendants the right to the assistance of counsel, which includes the right to obtain counsel of one's choice and to have a reasonable opportunity to consult with counsel. *See Chandler v. Fretag,* 348

U.S. 3, 9–10, 75 S.Ct. 1, 4–5, 99 L.Ed. 4 (1954). The Due Process clause of the Fifth and Fourteenth Amendment requires the same opportunity. "[D]ue [P]rocess demands that the defendant be afforded a fair opportunity to obtain the assistance of counsel of his choice to prepare and conduct his defense. The constitutional mandate is satisfied so long as the accused is afforded a *fair or reasonable* opportunity to obtain particular counsel and so long as there is no arbitrary action prohibiting the effective use of such counsel." *United States v. Fernandez*, 576 F.Supp. 397, 402 (E.D.Tex.1983).

The rights to a fair trial and choice of counsel embodied in the Due Process clause of the Fifth Amendment may, in some circumstances, come into play at a point earlier in time than the Sixth Amendment right to counsel. In such cases, the Fifth Amendment protects a defendant even before adversarial judicial proceedings are commenced. Fundamental guarantees of due process obey no timetable; they neither attach nor cease to apply at a particular moment. Instead, due process rights are violated at the point when an individual's rights to a fair trial and the choice of counsel are unduly, unfairly and unnecessarily obstructed without explanation or some showing of need to warrant that deprivation. When a grand jury target is arbitrarily deprived of the right to counsel of his own choice, such that he will be unfairly deprived of the right to the effective assistance of counsel at the trial itself, the due process clause has been violated, regardless of whether or not an indictment has been returned against the target. That is what occurred in this case.

### B. *Support in Precedent for Application of Fifth Amendment*

In *Kirby*, the Supreme Court held that the Sixth Amendment right to counsel did not attach at the time of a pre-indictment lineup and refused to impose a *per se* exclusionary rule on all identifications made during the course of that lineup. 406 U.S. at 690–91, 92 S.Ct. at 1882–83. None-

theless, the Court took pains to state that occasions may arise during the course of a criminal investigation when police identification procedures are so unnecessarily suggestive or conducive to irreparable mistaken identifications that, even though the Sixth Amendment has not yet attached, the Due Process Clause of the Fifth and Fourteenth Amendments would mandate the exclusion of these identifications. *Id.* This view strongly suggests that the right to a fair trial may be constitutionally impaired by government activities occurring prior to the commencement of formal judicial proceedings. When lack of counsel works a deprivation on a criminal suspect or target so prejudicial as to later deprive him of a fair trial, *Kirby* stands for the proposition that evidence so obtained will be excluded. In this case, where the potential harm posed prior to indictment is the later deprivation of a defendant's choice of counsel, the abuse cannot be remedied merely by applying an exclusionary rule, as *Kirby* indicates. Rather, to warrant the almost certain disqualification of the chosen attorney and the inevitable breakdown in the attorney/client relationship, the government must first prove that such loss is outweighed by its need for the information. A failure to make this showing deprives defendant of his due process rights to a fair trial.

This reading of *Kirby* finds support in earlier Supreme Court precedent and in other federal courts. For example, in *Powell* the court held in a capital case that where the defendant is unable to employ counsel and is incapable of making his own defense, then counsel must be assigned him as a necessary requisite of due process. 287 U.S. at 71, 53 S.Ct. at 65. Denial of some of the personal rights safeguarded by the first eight amendments would be a denial of due process "not because those rights are enumerated in the first eight amendments, but because they are of such a nature that they are included in the conception of due process of law.... the right to the aid of counsel is of this fundamental character." *Id.* at 67–68, 53 S.Ct. at 63–64.

Thus, the Supreme Court in *Powell* made clear the right to counsel considered in the context of due process is not always synonymous with the dictates of the Sixth Amendment right to counsel. Other courts have reached similar conclusions. *See Flanagan,* 679 F.2d at 1075 (violations of an accused's right to counsel are encompassed within the concept of due process, and the right to be represented by counsel of one's choice arises not only from the Sixth Amendment but also from the due process clause of the Fifth Amendment); *Dillon v. United States,* 307 F.2d 445, 446–47 (9th Cir.1962) ("appointment of counsel may sometimes be mandatory even in those areas in which the Sixth Amendment does not apply."); *Amusement Devices Ass'n v. State of Ohio,* 443 F.Supp. 1040, 1053 (S.D. Ohio 1977) (the command of the Due Process Clause of the Fourteenth Amendment is not limited, in area of the right to assistance of counsel, to the bare confines of the Sixth Amendment).

In another context, which has relevance to the present case, Justice Frankfurter wrote:

> The 'due process of law' which the Fourteenth Amendment exacts from the States is a conception of fundamental justice. (citations omitted) It is not satisfied by merely formal procedural correctness, nor is it confined by an absolute rule such as that which the Sixth Amendment contains in securing to an accused the 'Assistance of Counsel for his defence.'

*Foster v. Illinois,* 332 U.S. 134, 136, 67 S.Ct. 1716, 1717, 91 L.Ed. 1955 (1947). Because notions of due process are embodied within the Sixth Amendment right to counsel, the right to counsel emanating from the due process clause only attains any independent significance and merits special discussion in those situations where, as here, the Sixth Amendment guarantees do not apply.

Further, the right to counsel at trial, *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and on appeal, *Evitts v. Lucey,* — U.S. —, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985), includes the right to *effective* assistance of counsel. The core purpose is to guarantee a genuine adversary process. The Fifth Amendment guarantees a fair trial, but such is not limited to the rights of speedy and public trial, impartial jury, confrontation, compulsory process, the right to be informed of the nature and cause of the accusation made, and assistance of counsel. Fair trial envisions defense counsel playing a critical role in the adversarial system thereby furthering a just result. When the government through its actions unreasonably and unnecessarily interferes with counsel's ability to act independently as a true adversary, it has interfered with and tilted the delicate balance of that process. When the result of government activities prejudices the adversarial process, then the constitutional guarantee of a fair trial is violated.

## III. FIFTH AMENDMENT CONCERNS

Several consequences result from compelling attorney Slotnick to testify before the grand jury. The government argues and the majority agrees that unless it is first determined that Mr. Slotnick's testimony is admissible at trial and that he will be compelled to testify, defense counsel cannot be disqualified. To prevent disqualification, a defendant is entitled to have the government make a showing of need which, the government says, will be balanced against the defendant's right to counsel. So long as the attorney is not disqualified prior to the preliminary hearing at which the showing of need is made, the government concludes that the pre-indictment hearing which the panel decision required furnishes no more protection than is required at the preliminary hearing.

This argument ignores the law as well as human experience and logic. By the time of the preliminary hearing, the relationship between an attorney and his client will have been irreparably strained. Analysis of The Code of Professional Responsibility and accompanying case law demonstrates that this proposition is incorrect for anoth-

er reason. An attorney may be ethically disqualified after giving grand jury testimony adverse to his client's interests, even before a preliminary hearing determines whether that testimony will be used at trial. The attorney-client privilege is reviewed briefly because it sheds light on that issue.

### A. *Attorney-Client Privilege*

One of the protected common law privileges that would serve to quash a grand jury subpoena is that of a client and his attorney. It is the oldest privilege and, according to Professor Wigmore, dates back to the early 16th century. 8 J. Wigmore, *On Evidence* § 2290 (McNaughton rev.ed.1961). The privilege first arose as an exception to the testimonial compulsion for every man's evidence and is today a common law privilege recognized under Rule 501 of the Federal Rules of Evidence.

Although aware that defense counsel's presence at the grand jury to testify as to client identity and fee information is not within this privilege, *In re Shargel*, 742 F.2d 61, 62 (2d Cir.1984); *see Colton v. United States*, 306 F.2d 633, 637–38 (2d Cir.1962), *cert. denied*, 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963); *United States v. Pape*, 144 F.2d 778, 782 (2d Cir.), *cert. denied*, 323 U.S. 752, 65 S.Ct. 86, 89 L.Ed. 602 (1944), it is plain that enforcement of the subpoena will subvert some of the most vital concerns that the attorney-client privilege aims to safeguard. Full and complete disclosure by a client to an attorney is essential to the attorney's acting justly and effectively in the client's behalf. *Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976). As an old English case put it: "A man who seeks advice, seeks it because he believes that he may do so safely; he will rarely make disclosures which may be used against him." *Annesley v. Earl of Anglesea*, 17 How.St.Tr. 1129, 1225, 1241 (Ex. 1743) (cited in 8 Wigmore § 2291 at 545–46). No attorney can represent a client effectively, unless the client feels free to speak frankly to the advocate without fear that such disclosures will be used against him.

The protection of fundamental ethical and moral values is also safeguarded by the attorney-client privilege. Lay people caught in the labyrinth of complex criminal laws need lawyers to confide in, consult with and guide them. The privilege exists to encourage full and truthful communication between attorneys and their clients and "recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981).

The information sought in this case is not privileged. Yet compelling an attorney to testify against his client as to unprivileged information—whether or not any governmental need for that testimony exists—so disrupts the human feelings of trust and confidence essential to the existence of the attorney/client relationship as to *later* inhibit the client from freely confiding in his attorney information that is in fact privileged.

### B. *Consequences of Disrupting the Attorney-Client Relationship*

The duty of undivided loyalty of counsel to his client, traditionally considered an essential element in according a client his due process rights, is questioned by the client whenever his attorney is summoned before the grand jury—even if only to assert valid privileges—during the course of that representation. *In re Grand Jury Investigation, (Sturgis)*, 412 F.Supp. 943 (E.D.Pa. 1976). The power to hale an attorney to testify before the grand jury investigating his client—regardless of whether the government has good grounds to believe the attorney possesses any relevant information—gives the government unilaterally the power to destroy that relationship. Once destroyed, a post-indictment preliminary hearing cannot repair the loss of trust brought about after an attorney has appeared as a prosecution witness before the

grand jury. The loss is like that suffered by Humpty-Dumpty—all the King's horses and all the King's men could not put Humpty-Dumpty together again.

Thus, foremost among the consequences of subpoenaing an attorney before the grand jury is that it drives an insurmountable wedge between the attorney and his client, *see In re Grand Jury Matters*, 751 F.2d 13, 19 (1st Cir.1984). Forcing a client to choose between the Scylla of relying on present counsel who has gone before the grand jury and the Chrybdis of finding new, untested counsel puts a client unfamiliar with grand jury proceedings in a dilemma where whatever the choice made—it is an unsatisfying one. The result for the subpoenaed lawyer is equally inadequate. He has the so-called choice of either resisting disclosure with contempt possibilities—thereby risking his legal career—or resigning from the case.[1]

The negatives of these stygian alternatives ultimately will undermine confidence in the fairness and impartiality of the criminal justice system. Creation of all these untoward problems for the client and his counsel produces a Kafkaesque result that strikes directly at one of the bedrock values of the Fifth Amendment whose aim, as Justice Powell observed, "is to convey to the individual a feeling that the government has dealt with him fairly...." *Carey v. Piphus*, 435 U.S. 247, 262, 98 S.Ct. 1042, 1051, 55 L.Ed.2d 252 (1978). The failure to show need for the attorney's testimony generates not a "feeling ... that justice has been done" *Anti-Fascist Committee v. McGrath*, 341 U.S. 123, 171–72, 71 S.Ct. 624, 648–49, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring), but rather that injustice has become the rule.

### C. *Impact of the Code of Professional Responsibility*

DR 5-102(B) of the Code of Professional Responsibility provides that once a lawyer learns he may be called as a witness other than on behalf of his client, he may continue that representation only until it becomes apparent that his testimony may be prejudicial to his client. Decisional law indicates that 5–102(B) should not be a device to disqualify an opponent's attorney simply by calling him as a witness. In a close case, an attorney must respect his client's interests and resolve his doubts in favor of withdrawing as an advocate. *See Emerald Green Homeowners' Association, Inc. v. Aaron*, 90 A.D.2d 628, 628–29, 456 N.Y. S.2d 219 (3rd Dept.1982) (attorneys should withdraw at as early a stage in the proceedings as possible to enable their clients to secure new counsel). A committee of The American Bar Association in Formal Opinion 339 (January 31, 1975) found that it is seldom, if ever, that an adversary or other party would call the attorney for

---

**1.** In a recent survey conducted by William J. Genego, a professor of law at the University of Southern California Law Center, 80 percent of 1,648 responding members of the National Association of Defense Lawyers said that they believed government subpoenas issued to them relating to fees were being served solely to discourage zealous advocacy on behalf of criminal defendants. These subpoenas are being aimed at the most experienced and most successful criminal defense lawyers in order to prevent them from representing suspected white-collar criminal defendants. As predicted, this technique has proved effective since most subpoenaed lawyers end up withdrawing from representation before being disqualified or the client drops the lawyer because he has lost trust in his chosen advocate. *N.Y. Times,* November 21, 1985, at A20, col. 1.

The devastating result of this government practice has been that 14 percent of those responding lawyers said they had declined certain cases—notably those involving drug smuggling or organized crime—for fear of later disqualification or dismissal by the client. Forty-six percent said they have revamped their practices to refuse cases in which a defendant wants to pay cash or in which a third-party is paying the fee. The New York City Bar's Committee on Criminal Advocacy recommended on November 25, 1985 more stringent guidelines than those adopted last spring by the Department of Justice. These guidelines would require that subpoenaed material be relevant and material, as well as "essential" to a government investigation. Prosecutors, under this proposal, would be required to file "Affidavits of Necessity," before seeking lawyer subpoenas, to ensure there is no other source for the information. *National Law Journal,* December 9, 1985, 3, 8.

testimony within the exceptions set forth in DR 5-101(B)(1), (2), or (3). And, if the testimony would be adverse to the client, there would be very few situations in which accepting employment as trial counsel would be justified under DR 5–101(B)(4).

If the government prevails in this case, it signals to an attorney that he *might* be called to testify about fee information if at all relevant to the government's case. Without a pre-indictment showing of need, no attorney would know whether his .fee testimony would be important to the government's case, but he would know that his testimony *may be prejudicial to his client* and, in the client's best interests, should probably disqualify himself prior to the preliminary hearing. Hence, due process concerns mandate that the government make its showing of need before devastating a defendant's ability to conduct its defense. It is not intended to make privileged those conversations or documents that the law clearly considers to be non-privileged.

Moreover, the government makes no convincing arguments why it cannot make its showing of need earlier in time. It claims that it will not know what it needs until an indictment has been returned. This contention is somewhat less than credible because there is no reason why the attorney could not be subpoenaed last by the grand jury, after all other government witnesses have testified, and at a time when the government has a better sense of the evidence it lacks to make out an indictment.·

Common·sense dictates such a conclusion. If a showing of need is made before the attorney testifies and the government satisfies a need requirement, then an attorney possessing incriminating· evidence should disqualify himself from representation both because the likelihood of the attorney being required to testify at trial is strong, and because early withdrawal affords defendant an opportunity to secure new counsel at a time early enough to be meaningful. If a showing of need is not required until a preliminary hearing, counsel's disqualification occurs late· in the pro-

ceedings, and a new counsel's ability to prepare is curtailed.

## PRACTICAL CONSIDERATIONS

Viewed practically, this is not an appropriate case to decide whether the government must make a pre-indictment showing of need before it compels an attorney for a target of a grand jury's investigation to appear before it and testify to unprivileged information. Under the unusual facts before it the district court should have exercised its supervisory powers under Fed.R. Crim.P. 17(c) and quashed this subpoena. Two reasons compel this conclusion. The government's attorney conceded that counsel Slotnick's testimony would almost certainly disqualify him from representation, and the approval of the subpoena by this Court would now serve to condone a violation of the government's newly-published Guidelines for issuing subpoenas. Hence, the failure of the district court to quash this subpoena constituted an abuse of discretion, which should be reversed. *See In re Grand Jury Matters,* 751 F.2d at 18.

### A. *Concession by the Government*

The government conceded that subpoenaing the target's attorney would disqualify him. On three occasions—in oral argument before the district court, by affidavit, and in its brief on appeal—the prosecutor acknowledged that the result of its issuing a subpoena to Mr. Slotnick would cause a conflict that would almost certainly prevent him from further representing Colombo. The original panel.relied on the government's concession, to conclude·that *under such a circumstance,* the district court abused its discretion by refusing·to quash a subpoena under Fed.R.Crim.P. 17(c).

When the government by that concession indicated its knowledge that its action would thereby render meaningless Colombo's right to counsel, it is unsound legally and logically to say that Colombo's Sixth Amendment right to counsel was not at least implicated at the grand jury stage, as· Chief Judge Feinberg succinctly observes, even if Colombo had not yet been indicted

on the other now pending charges. The panel majority believed that under the court's supervisory powers the government should be required to make a showing of need.

### B. *Government Ignored Its Own Guidelines*

The government itself recognizes the dangers posed to the attorney-client relationship when it summons an attorney to testify before the grand jury. To remedy that problem, the Justice Department has adopted internal guidelines requiring reasonable need and no other reasonably alternative source before issuing a subpoena. Those Guidelines, set forth in 9 U.S. Attorneys' Manual 9–2.161(a) 37 Cr.L. 2100 (May 1, 1985), provide in pertinent part: "B. [a]ll reasonable attempts shall be made to obtain information from alternative sources before issuing a subpoena to an attorney for information relating to the representation of a Client." In a criminal investigation, F.(1) specifies that in approving the issuance of a subpoena "[t]here must be reasonable grounds to believe ... that the information sought is reasonably needed for the successful completion of the investigation," and in F.(3) it is stated that "[a]ll reasonable attempts to obtain the information from alternative sources shall have proved to be unsuccessful." Finally, in F.(5) the Guidelines require that subpoenas "shall be narrowly drawn."

A brief summary illustrates that here those Guidelines specified in F.(1), F.(3) and F.(5) were completely ignored: (1) the subpoena was drawn broadly to include "any and all records ... not limited to ... fees ... received by Slotnick."; (2) at oral argument the government argued that since a lawyer representing a client provides the best evidence relating to fee information, no alternative source need be explored; (3) the Guidelines in F.1 specifically require that the information sought must be shown to be *reasonably needed.* Obviously, courts cannot safely rely on the government's internal monitoring to protect rights jeopardized by the issuance of such subpoenas. Perhaps in recognition of the unreliability of such internal monitoring, Massachusetts' highest court, in October, 1985 made it unprofessional conduct for a prosecutor to subpoena an attorney representing a client before a grand jury without prior judicial approval. *National Law Journal,* November 4, 1985, at 3.

### C. *Exercise of Supervisory Power*

Under Rule 17(c) a court "may quash or modify the subpoena if compliance would be unreasonable or oppressive." Broad authority exists for a court to exercise its 17(c) supervisory power even though the property subpoenaed is not subject to a statutory, constitutional, or common law privilege. *In Re Grand Jury Matters,* 751 F.2d at 17–18.

Courts have used their supervisory powers to quash grand jury subpoenas when issued to an attorney or to a potential target, when no showing of relevance or need was supplied by the government. *See id.; In Re Special Grand Jury No. 81–1 (Harvey),* 676 F.2d 1005, 1012 (4th Cir.1982) *vacated and withdrawn when grand jury indicted target and he became fugitive,* 697 F.2d 112 (4th Cir.1982) (en banc); *In Re Grand Jury Proceedings (Schofield),* 486 F.2d 85, 93 (3d Cir.1973); *In re Grand Jury Matters,* 751 F.2d at 13 (subpoenas concerning fee arrangements held invalid when served on criminal defense attorneys whose clients had cases pending in state court and were under investigation in federal court). Under the circumstances of the instant case the issuance of the subpoena was unreasonable because of the recited government concession, and the utter disregard by the government of its own Guidelines.

### CONCLUSION

Accordingly, I vote to reverse the order of the district court, quash the subpoena, and direct the government to make the requisite showing of relevancy and need before it subpoenas attorney Slotnick.