**In re GRAND JURY SUBPOENA FOR ATTORNEY REPRESENTING CRIMINAL DEFENDANT Jose Evaristo REYES–REQUENA.**

No. 89–6252.

United States Court of Appeals, Fifth Circuit.

Sept. 19, 1990.

Paula Offenhauser, Asst. U.S. Atty., Henry K. Oncken, U.S. Atty., Lawrence D. Finder, Asst. U.S. Atty., Houston, Tex., Merv Hamburg, Atty., Dept. of Justice, Appellate Section, Crim.Div., Washington, D.C., for appellee.

Dick DeGeurin, DeGeurin & Nugent, Edward A. Mallett, Houston, Tex., for Mike DeGeurin.

Mike DeGeurin, Foreman, DeGeurin & Nugent, Houston, Tex., for Jose Evaristo Reyes Requena.

Gerald Goldstein, San Antonio, Tex., for amicus curiae, Nat. Ass'n of Crim. Defense Lawyers (NACDL).

Kent A. Schaffer, Houston, Tex., for amicus curiae, Texas Crim. Defense Lawyers Ass'n (TDCLA).

Jack B. Zimmerman, Houston, Tex., Jeffrey R. White, Washington, D.C., Russ M. Herman, New Orleans, La., Mike Starr, Gen. Counsel, Washington, D.C., for amicus curiae, Ass'n of Trial Lawyers of America (ATLA).

Jim E. Lavine, Houston, Tex., for Harris County Criminals Lawyers Ass'n (HCCLA).

Before JONES, DUHÉ and WIENER, Circuit Judges.

EDITH H. JONES, Circuit Judge:

We confront here the tension between the requirement that every citizen be prepared to offer his testimony to a grand jury and the entitlement of every criminal defendant to the single-minded attention of his attorney. The U.S. Attorney's office subpoenaed Mike DeGeurin, who had appeared as counsel for Jose Evaristo Reyes–Requena, to testify before a grand jury in the short interval between Reyes–Requena's pretrial detention hearing and his indictment by that same grand jury. DeGeurin moved to quash the subpoena. After a hearing, the district court granted the motion to quash. 724 F.Supp. 458 (S.D.Tex. 1989). On the day of oral argument in our

court, we issued an order reversing the district court's decision.[1] Our reasons for doing so require further explanation and a careful chronology of the proceedings to date.

## I. THE PROSECUTION OF REYES–REQUENA

When late one evening, federal and state drug agents executed a search warrant on a ranch-type house in Houston, Texas, they observed Reyes–Requena arising from a bedroll on the floor of the living room, with a loaded .357 magnum revolver beneath his sleeping pad.[2] A woman and young boy were also in the house. Earlier that day, during surveillance of the property, officers had observed two individuals load boxes into a rental car, after which one person drove off while the other entered the house. The car was apprehended and discovered to contain cocaine. Until the search warrant was executed, no one else was seen entering or leaving the residence.

In the bedroom, the officers found eight U–Haul cartons containing approximately 160 separately wrapped kilogram packages of cocaine. One of the cartons was open. In the kitchen, there was an unloaded .357 magnum revolver and a package containing 1½ ounces of cocaine. A box of ammunition was located a few feet away from Reyes–Requena's bedroll. Drug paraphernalia, including tally sheets, scales, sixteen unfolded U–Haul cartons, and taping materials, were located in closets.

Reyes–Requena was interviewed by an FBI agent after receiving *Miranda* warnings. According to the agent, Reyes–Requena said that he had arrived from Matamoros, Mexico, two months before; that he was unemployed; that he had met an individual whom he called "Chapa"; and that Chapa had offered Reyes–Requena the use of the house, food and money if he would stay there and safeguard the house and its contents. Reyes–Requena refused to give a physical description of Chapa other than

to identify him as a Hispanic male. Reyes–Requena denied any knowledge that the boxes, which he had seen being taken into and out of the house, contained cocaine. He also denied knowledge of the revolver found under his sleeping bag.

Guadelupe, the woman found in the house, told agents that she had met Reyes–Requena in Matamoros, and he had invited her to stay in the house when she arrived from Mexico two weeks earlier. She said she did not know what was in the house and never saw anything there.

In the interim between Reyes–Requena's detention hearing and events pertinent to this matter, Reyes–Requena has been indicted, tried, and convicted of possession of cocaine with intent to distribute and possession of a firearm in the course of committing a felony. *See* 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 924(c). In oral argument we were informed that Reyes–Requena has been sentenced to fifteen years' imprisonment.

## II. MIKE DeGEURIN AND THE GRAND JURY SUBPOENA

A magistrate conducted a preliminary hearing concerning Reyes–Requena on September 22, 1989, four days after his arrest. Mike DeGeurin, an experienced criminal defense counsel in private practice, appeared on the defendant's behalf. The magistrate concluded that the government had demonstrated probable cause to believe that Reyes–Requena had committed an offense, and he set bond at $100,000. The record does not reflect whether Reyes–Requena posted bond.

The same day, a grand jury in the Southern District of Texas issued a subpoena to DeGeurin directing him to appear on September 29 and produce records dealing with the fee arrangement he had made for representing Reyes–Requena.

Events then moved rapidly. DeGeurin filed a motion to quash, supported by his

---

**1.** We are informed that the term of the grand jury considering these matters will expire September 28, 1990.

**2.** This recitation of facts surrounding the prosecution derives from the transcript of Reyes–Requena's detention hearing.

affidavit. Amici curiae representing various organizations moved to intervene and support DeGeurin.[3] Neither DeGeurin nor the government proffered evidence for *in camera* inspection. The court held argument on the motion to quash on October 2 and thereafter entered an order granting the motion. Reyes–Requena was indicted on October 16.

DeGeurin's affidavit identified Reyes–Requena as his client and, after summarizing the proceedings up to October 2, stated as follows:

> The prosecutor now seeks to determine the amount of my fee and the identity of the person who has agreed to pay the fee. It is my opinion and belief that for me to reveal the amount of the fees, how it was paid, fee agreements and whether a third party was involved would violate my client's Fifth and Sixth Amendment rights, would violate his due process rights to a no-bill by the Grand Jury, could provide evidence against my client as an "affirmative link" to the contraband sufficient to assure his indictment and conviction, could subject him to greater penalty under the Federal Sentencing Guidelines and would be in violation of Canon 4 of the Code of Professional responsibility.

The principal grounds on which DeGeurin relied to quash the subpoena included an assertion of the attorney-client privilege, interpreted in light of this circuit's *Jones*[4] decision; Fed.R.Crim.P. 17(c); the Sixth Amendment; Guidelines for Attorney Subpoenas issued by the United States Department of Justice; and the Code of Professional Responsibility.[5]

The government contested each of these arguments. In addition, responding to the complaint that DeGeurin's grand jury testimony would force him to be a witness against his client and would provoke his disqualification, the government stated that it would not use fee information against Reyes–Requena before the grand jury or at his trial. (R. 207–08).

Judge Hittner's thoughtful opinion rejected the last two grounds urged by DeGeurin,[6] but it found the first three arguments persuasive. Judge Hittner particularly relied upon his interpretation of *Jones* as establishing an attorney-client privilege that shielded DeGeurin from revealing fee information concerning Reyes–Requena, including specifically whether a third party benefactor had paid Reyes–Requena's fees. He found the timing of the issuance of the subpoena, *i.e.*, during the pendency of criminal proceedings against Reyes–Requena, to be relevant. He found that the attorney-client privilege was not being invoked as a shield for continuing illicit activity. *See In re Grand Jury Proceedings (Pavlick)*, 680 F.2d 1026 (5th Cir. Unit A 1982) (en banc); *In re Grand Jury Subpoenas (Hirsch)*, 803 F.2d 493, 499 (9th Cir.1986), *supplemented*, 817 F.2d 64 (9th Cir.1987). He also concluded that the government's case against Reyes–Requena was weak because his "mere presence" at the house where cocaine was stored did not suggest complicity in an illegal enterprise. *Cf. United States v. Vergara*, 687 F.2d 57, 61 (5th Cir.1982) ("[M]ere presence at the scene of the crime or close association with a co-conspirator will not support an inference of participation in a conspiracy...."). Thus, "a subpoena to Reyes–Requena's attorney ... could elicit information provid-

---

**3.** These organizations were the National Association of Criminal Defense Lawyers, the Association of Trial Lawyers of America, the Texas Criminal Defense Lawyers Association, and the Harris County (Texas) Criminal Lawyers Association.

**4.** *In re Grand Jury Proceedings (Jones)*, 517 F.2d 666 (5th Cir.1975).

**5.** DeGeurin also contended in the district court that if he responded to the subpoena, he would jeopardize both *his* rights under the Sixth

Amendment and his client's Fifth Amendment right against self-incrimination, and he would fall prey to the government's intentional ploy to disqualify him as counsel for Reyes–Requena. These points were not considered by the district court nor pursued in DeGeurin's briefs here, and to the extent they have any arguable merit, they are waived. *United Paperworkers Int'l Union v. Champion Int'l Corp.*, 908 F.2d 1252, 1255 (5th Cir.1990).

**6.** DeGeurin does not pursue on appeal the two arguments rejected by the district court.

ing an affirmative connection between [Reyes–Requena] and the cocaine" and could yield evidence that "would tend to connect" the defendant to the cocaine and "may provide evidence of the existence of a conspiracy," a possible additional charge against the defendant. The opinion acknowledged that in other contexts, the information sought by the subpoena might not be privileged, but that it satisfied the *Jones* standard of furnishing a "crucial link" in the government's case.

The district court sought further support from its supervisory power to quash grand jury subpoenas "if compliance would be unreasonable or oppressive." Fed.R. Crim.P. 17(c). The court found that the timing of the subpoena impinged upon the attorney-client relationship and severely hindered the effectiveness of DeGeurin's representation.

The court finally held that Reyes–Requena's Sixth Amendment right to counsel was infringed by enforcement of the subpoena inquiring into the attorney's fee arrangement with his client during the course of pre-indictment proceedings.[7] This conclusion was based upon the constitutional presumption in favor of a defendant's choice of counsel, *Wheat v. United States*, 486 U.S. 153, 164, 108 S.Ct. 1692, 1699, 100 L.Ed.2d 140 (1988), the strong possibility that enforcement of the subpoena would cause counsel's disqualification during the pendency of proceedings, and the apparent absence of any overriding governmental interest.

The government timely appealed. Our appellate jurisdiction arises from either 28 U.S.C. § 1291 or 18 U.S.C. § 3731. *In re Grand Jury Subpoena (Kent)*, 646 F.2d 963, 967–68 (5th Cir. Unit B June 1981).

## III. DISCUSSION

We are hardly covering new ground in this appeal. The last decade has produced a number of federal cases exploring the extent to which an attorney may resist a subpoena issued by a grand jury that is investigating one of his clients.[8] Although such subpoenas pose the particularly troublesome possibility of intrusion by prosecutorial authorities into the attorney-client relationship, the principles on which they should be enforced now seem—with the exception of that espoused by our *Jones* decision—fairly consistent. We hope to alleviate that source of confusion here.

■ A district court's order quashing a grand jury subpoena can only be overturned for an abuse of discretion. *Hirsch, supra,* 803 F.2d at 496; *In re Grand Jury Matters,* 751 F.2d 13, 16 (1st Cir.1984). The district court was working under considerable pressure to evaluate the DeGeurin subpoena in time to minimize its interference at a critical stage of Reyes–Requena's defense. Nevertheless, on careful review, we must conclude that the district court incorrectly found the existence of an attorney-client privilege with respect to disclosure of the source or payment terms of DeGeurin's fees. Nothing in the record reflects that this information was either a confidential communication between De-Geurin and Reyes–Requena, or inescapably tied to such a communication, and *Jones* does not make it so. Second, the record is too sparse to demonstrate a Sixth Amendment violation at the time of the hearing, and no violation can be claimed now. Third, although the court, in exercising its supervisory power over the grand jury, might not have abused its discretion in quashing the subpoena solely because of its oppressive timing, that basis for the court's action has evaporated following Reyes–Requena's conviction. The passage of time has thus transformed what would otherwise be an order supportable on very narrow grounds into one that has no support in law or in present facts. Each basis for our rejection of the court's order will be discussed in turn.

---

7. The government does not contest that Reyes–Requena's right to counsel had already attached at the probable cause hearing. *See United States v. Gouveia*, 467 U.S. 180, 187–88, 104 S.Ct. 2292, 2296–97, 81 L.Ed.2d 146 (1984).

8. See citations *infra.*

## A.  Attorney–Client Privilege

■ "We have long recognized the general rule that matters involving the payment of fees and the identity of clients are not generally privileged. *In re Grand Jury Proceedings (United States v. Jones)*, 517 F.2d 666 (5th Cir.1975); *see* cases collected *id.* at 670 n. 2." *In re Grand Jury Proceedings (Pavlick)*, 680 F.2d 1026, 1027 (5th Cir. Unit A 1982) (en banc). DeGeurin urges that *Jones* supports his claim for an exception to that general rule and consequently shields him from disclosing, *inter alia,* whether his client Reyes–Requena or an anonymous third party paid his fee.

■ Before logically reaching the question of the application of the attorney-client privilege, however, one must determine that the claim of privilege is being made by an attorney on behalf of a client. In nearly every case that has discussed the propriety of a subpoena issued to compel an attorney to furnish fee information before the grand jury, the attorney declined to reveal the name of an anonymous client who paid the fee. *See, e.g., Pavlick, supra; In re Grand Jury Subpoena Served upon Doe*, 781 F.2d 238 (2d Cir.) (en banc), *cert. denied sub nom. Roe v. United States*, 475 U.S. 1108, 106 S.Ct. 1515, 89 L.Ed.2d 914 (1986); *In re Grand Jury Investigation No. 83-2-35*, 723 F.2d 447 (6th Cir.1983), *cert. denied sub nom. Durant v. United States*, 467 U.S. 1246, 104 S.Ct. 3524, 82 L.Ed.2d 831 (1984); *In re Grand Jury Proceeding (Cherney)*, 898 F.2d 565 (7th Cir. 1990); *see also In re Grand Jury Proceedings Subpoena to Testify to: Wine*, 841 F.2d 230, 233 n. 3 (8th Cir.1988) (disclosure of third-party fee-payer who was not client of attorney would not be protected by the attorney-client privilege).

What was overlooked by the district court, and what distinguishes this case from others analyzing attorney grand jury subpoenas, is that neither the identity of the fee-payer nor the source of DeGeurin's fees for Reyes–Requena's defense has been tied to a client of DeGeurin. Certainly, DeGeurin represented Reyes–Requena, and the district court's opinion assumed that the information concerning the name of the payer and the payment arrangement of Reyes–Requena's fees was attributable to his status as a client of DeGeurin. This assumption is unfounded. DeGeurin's affidavit, quoted previously, makes no claim that the person who has agreed to pay his fee is his client. The affidavit states only that if DeGeurin were to reveal the amount or source or payment terms for the fee, it would provide evidence against "his client." In context, the "client" referred to is clearly Reyes–Requena. The affidavit does not even assert that information regarding the source or payment of the fees derived from any communication between Reyes–Requena and DeGeurin.

On this fundamental basis, the instant case differs from *Jones*, in which the anonymous parties, whose names the grand jury sought and who had paid the fees of the attorneys' known clients, were *also* their clients. *Jones* rested on the premise that to identify the anonymous fee-payer clients would, under the unique circumstances of that case, both incriminate them and reveal confidential communications crucial to the government's investigation. Reyes–Requena, by contrast, was already known to be DeGeurin's client, and he retained DeGeurin for events known to the government at the time of the grand jury subpoena. *Jones* prevented the prosecutors from stripping the anonymity from a client otherwise unknown to them. If Reyes–Requena is the client who paid De-Geurin's fees, he is not unknown to the prosecutors, and *Jones* does not apply. *See In re Grand Jury Subpoenas (Anderson)*, 906 F.2d 1485, 1490–91 (10th Cir.1990) (distinguishing *Jones* from case where it appeared that anonymous third-party payer of fees was not a client of the attorney). If a third-party benefactor paid the fees, *Jones* only comes into play if that person is DeGeurin's client. DeGeurin of course has the burden to establish his claim of attorney-client privilege as to the anonymous payer. *See Pavlick, supra,* 680 F.2d at 1029 (Rubin, J., concurring). Because DeGeurin has never averred that the anonymous benefactor of Reyes–Requena (if there is one) was his client, he cannot obtain succor from *Jones*. Our brothers in

the Eleventh Circuit, bound by *Jones*, have recognized this distinction repeatedly. *In re Grand Jury Proceedings (Rabin)*, 896 F.2d 1267, 1273 (11th Cir.), *vacated as moot*, 904 F.2d 1498 (11th Cir.1990) (en banc); *United States v. Sims*, 845 F.2d 1564, 1569 (11th Cir.), *cert. denied*, 488 U.S. 957, 109 S.Ct. 395, 102 L.Ed.2d 384 (1988); *In re Grand Jury Investigation (Harvey)*, 769 F.2d 1485, 1487 (11th Cir. 1985).

Even if DeGeurin had asserted that the anonymous fee-payer was his client, it is not at all clear that the attorney-client privilege would suppress evidence of the fact of an arrangement or payment made for Reyes–Requena's defense. Judge Rubin, concurring in *Pavlick*, contended that no attorney-client privilege had been established between the attorney and the anonymous fee-payer, as to his payments on behalf of Pavlick's other clients. 680 F.2d at 1029. Judge Rubin observed that Pavlick had presented no evidence that the communications between himself and the third-party fee-payer concerning payment of the defendants' legal expenses were for the purpose of obtaining legal advice for the third-party. *Id.; see also, In re Subpoena Duces Tecum Served upon Shargel*, 742 F.2d 61 (2d Cir.1984). So it would appear here. Without proof of a confidential communication between DeGeurin and any third-party fee-payer, a threshold test for application of the attorney-client privilege is not met. *See United States v. Ponder*, 475 F.2d 37, 39 (5th Cir.1973).

Although we are convinced that a prerequisite to *Jones* is the existence of an anonymous fee-payer who is also the client of the attorney subpoenaed to testify before a grand jury, we shall, in an abundance of caution, demonstrate that *Jones* fails on its own terms to apply to this case. Compare *Pavlick* where Judge Gee's opinion for the court assumed that an attorney-client rela-

tionship existed between Pavlick and the anonymous benefactor and, based on that assumption, rendered a limited interpretation of *Jones*.

*Jones* is not unlike actor Peter Sellers' famous character Inspector Clouseau: it has been misunderstood because it invited misunderstanding. We conclude that a proper reading of *Jones*, followed by *Pavlick*, demonstrates that those cases did not fashion a "last link" or "affirmative link" attorney-client privilege independent of the privileged communications between an attorney and his client. Thus, the "last link" or "affirmative link" language in these cases does not significantly amend the normal scope of the attorney-client privilege, nor is it applicable to the case before us.

In *Jones*, the court quashed an attorney subpoena seeking to ascertain the names of clients who had paid substantial sums, partly in cash, for bonds and representation by the attorneys of certain drug-traffickers. The facts are peculiar, even in this day of aggressive prosecution:

> Among those "peculiar facts" was that the six attorneys drawn before the grand jury in *Jones* represented a generous portion of the criminal law bar of the lower Rio Grande Valley area, and the project was a rather broad attempt to canvass that portion for information detrimental to certain of its clients: that each had paid an attorney or attorneys amounts greater than his reported gross income during the year of payment.

*Pavlick*, 680 F.2d at 1027. Two points are critical to understanding *Jones*. First, the court stated repeatedly that its decision was fact-specific: "Other cases must turn on their own merits." *Jones*, 517 F.2d at 668.[9]

■ Second, despite the opinion's frequent references to the potentially incrimi-

---

9. Other indications of the opinion's narrow compass include the following: "Our decision to reverse rests on ... a discrete issue...." *Id.* "The cases applying the exception [to the rule of non-confidentiality] have carved out only a limited and rarely available sanctuary, which by virtue of its very nature must be considered on a case-to-case basis." *Id.* at 671. "We need not

say a great deal more in order to decide this case on its peculiar facts." *Id.* at 675. "[O]ur decision should not be taken as any indication of how we would decide a similar question if the inculpatory value of sought-after testimony were less obvious or largely attenuated. Each of these cases must turn on its own facts." *Id.*

nating nature of the testimony sought from the attorneys, *Jones* does not seem to rest on that fact *apart from* its necessary, simultaneous revelation of confidential communications. Thus, the court cites *Baird v. Koerner*, 279 F.2d 623, 633 (9th Cir.1960), for the proposition that revealing a client's identity would, under the circumstances of that case, reveal the confidential purpose for retaining the attorney. *Jones* then refers to Wigmore's admonitions that "the privilege should be held to protect the client from disclosure by the attorney of the client's 'ultimate motive' for seeking legal advice." *Jones*, 517 F.2d at 672; *see also* 8 J. Wigmore, *Evidence* § 2313, at 609 (J. McNaughton rev.1961). Finally, *Jones* cites with approval a Fourth Circuit case in which an attorney was not forced to divulge to the grand jury the name of his client, where to do so would reveal the confidential motive for retention. *See* *NLRB v. Harvey*, 349 F.2d 900, 905 (4th Cir.1965). In *Harvey*, the grand jury had already learned that the subpoenaed attorney had hired a private investigator to learn about certain labor union activities.

Identifying the client would have breached the attorney-client privilege by disclosing the confidential purpose for retention. In light of such citations, *Jones* seems reconcilable with, if perhaps a modest extension of, the now-settled principle that the attorney-client privilege shields the identity of a client or fee information only where revelation of such information would disclose other privileged communications such as the confidential motive for retention.[10] *See, e.g., In re Witnesses Before the Special March 1980 Grand Jury*, 729 F.2d 489 (7th Cir.1984). The opinion's references to "links in the chain," inartfully directed at the inculpatory nature of the information, actually depend upon the "link" between the inculpatory information and the disclosure of a confidential communication.[11]

Our decision in *Pavlick* is not inimical to this reading of *Jones*, nor can it be said to endorse even the "last link" concept that it attributes to *Jones*. The majority of the en banc court held that attorney Pavlick could not refuse to reveal the name of an anonymous fee-payer who was also his client, because that information fell within the

**10.** This analysis of *Jones* has recently been explained in greater detail by the Eleventh Circuit, albeit in an opinion vacated for mootness by the court *en banc*. *See In re Grand Jury Proceedings (Rabin)*, 896 F.2d 1267, 1270–73 (11th Cir.), *vacated as moot*, 904 F.2d 1498 (11th Cir.1990) (en banc).

**11.** As the government's brief pointed out, *Jones* "stands needlessly alone" if it created an attorney-client privilege for information that is inculpatory without revealing any confidential communication. Other circuits have either rejected a literal interpretation of the "last link" doctrine or have interpreted *Jones* (and *Baird v. Koerner, supra* ) to protect client identity and fee information if disclosure would reveal confidential communications. *See In re Grand Jury Subpoena Duces Tecum Served upon Shargel*, 742 F.2d 61 (2d Cir.1984) (holding that absent "special circumstances," identity of client and source of fee are not protected by attorney-client privilege and rejecting cases that adhere to "incrimination rationale"); *United States v. Liebman*, 742 F.2d 807 (3d Cir.1984) (rejecting "last link" if it is tied to inculpatory facts rather than to confidential communications and holding that identity of client is protected where so much of actual attorney-client communication has been disclosed that further identification will reveal the confidential communication); *NLRB v. Harvey, supra*, 349 F.2d at 905; *In re Grand Jury Investi-*

*gation No. 83–2–35*, 723 F.2d 447, 452–54 (6th Cir.1983), *cert. denied, sub nom. Durant v. U.S.*, 467 U.S. 1246, 104 S.Ct. 3524, 82 L.Ed.2d 831 (1984) (rejecting literal "last link", but holding that client identity could be privileged if disclosure would reveal confidential client communications); *In re Grand Jury Proceeding (Cherney)*, 898 F.2d 565 (7th Cir.1990) (holding that privilege applies if revealing client's identity would disclose the confidential motive for attorney's retention), *Tornay v. United States*, 840 F.2d 1424, 1428 (9th Cir.1988) (holding that *Baird* applies only when it is shown that disclosure of client's identity or fee arrangement would reveal information "tantamount" to a confidential professional communication); *In re Grand Jury Subpoena for: Osterhoudt*, 722 F.2d 591, 593 (9th Cir.1983) (per curiam) (interpreting *Baird* as based on the possible disclosure of confidential communications if identity of clients was disclosed); *see also* D. Louisell & C. Mueller, *Federal Evidence* § 210, at 780 n. 25 (1985), (describing *Jones* as shifting back and forth in its rationale for supporting the privilege). We believe that *Jones* and *Pavlick*, as we read them, and as they have been construed by our sister circuits, are generally consistent with these authorities. The Seventh Circuit and the Eleventh Circuit have construed *Jones* in similar fashion. *See In re Witnesses Before the Special March 1980 Grand Jury, supra; Rabin, supra* note 10.

crime-fraud exception to the attorney-client privilege: part of the fee-payer's illegal agreement with the attorney's known clients was a promise to "take care" of them if arrested. *Pavlick* cited the crime-fraud exception as the critical distinction between that case and *Jones*. 680 F.2d at 1028. The majority's further comments on *Jones* are superfluous to this reasoning. Further, the court's recognition of *Jones* as a limited and narrow exception to the general rule of non-confidentiality of information concerning client identities and fees; its emphasis on the "peculiar facts" of *Jones;* and its "last link" description of the case are hardly a ringing endorsement of *Jones*. *Id.* at 1027. *Pavlick* may be read as limiting *Jones* to its precise facts. Certainly, *Pavlick* is consistent with confining *Jones* to the recognized rule that client retention and fee information may become privileged if their revelation would in itself reveal a confidential communication.

In none of its guises does the misunderstood *Jones* case permit DeGeurin to shield from the grand jury the fee arrangements for Reyes–Requena and the identity of the fee-payer. First, to the extent *Jones* is properly understood as protecting a disclosure that would reveal the confidential motive for retention of the attorney, that rationale cannot apply here. Reyes–Requena's representation by DeGeurin is obvious. DeGeurin took no steps to demonstrate any confidential communication involved in his fee arrangement with Reyes–Requena. His conclusory affidavit is insufficient. *See In re Grand Jury Investigation No. 83-2-35*, 723 F.2d 447, 454 (6th Cir.1983), *cert. denied sub nom. Durant v. United States*, 467 U.S. 1246, 104 S.Ct. 3524, 82 L.Ed.2d 831 (1984).

Second, except for the circumstance of its timing discussed below, the grand jury subpoena to DeGeurin is not fraught with the "peculiar facts" that underlay *Jones*. DeGeurin alleged, but offered no proof that the government's motive was to disqualify him, and other capable private defense counsel, from representing Reyes–Requena. The government's interest in the source of Reyes–Requena's fee is legit-

imate, for the case suggests the existence of a significant cocaine distribution network in which Reyes–Requena was a minor figure. In distinction to *Jones*, the government's motives in this case seem to be purely investigatory rather than inculpatory. Whereas in *Jones*, the government was on the verge of pressing tax evasion charges against the unidentified but suspected clients, here, it is undisputed that the government has no inkling of the source of Reyes–Requena's fees. Speculation about the source of the fees is premature, hence non-probative and non-inculpatory as to Reyes–Requena.

▮ Third, even if we apply the "last link doctrine" literally—for the first time in this court since *Jones* was decided fifteen years ago—DeGeurin's fee information provides no "affirmative link," much less a "last link," between Reyes–Requena and a criminal indictment. That a third party may have paid Reyes–Requena's legal fees no more exposes Reyes–Requena to a conspiracy charge than do the already-disclosed connections between him and both "Chapa" and the other individual who loaded the car outside the house where he was arrested. The district court erred, whether as a matter of fact or of law, in accepting defense counsel's characterization of the government's case as "weak" and based on the "mere presence" doctrine, in order to bolster its finding of an "affirmative link." The transcript of the detention hearing shows that Reyes–Requena had spent two months living at and "guarding" a substantial cocaine storage depot and that he disingenuously claimed not even to know about the loaded revolver lying beneath his bedroll, with ammunition nearby. Without laboring the point further, the evidence was sufficient to convict Reyes–Requena without any attorney fee information.

This leads us to an additional fact undercutting the trial court's finding of an "affirmative link": the government represented in its pleadings to the district court that it would not use Reyes–Requena's fee information against him in the grand jury or

at trial.[12] To the extent that *Jones* rests, however tenuously, on the inculpatory nature of the fee information, such a concern is wholly vitiated here by the government's concession.

Finally, *Jones* itself stated that identification relating to retention of the attorney by a third party who is *not* a client or the client's agent "might lend weight to a contrary result." 517 F.2d at 675 (citing *Baird v. Koerner, supra,* 279 F.2d at 632). Thus, any claim that the recognition of an attorney-client privilege is demanded by *Jones* depends on an initial admission, not made here, that Reyes–Requena himself paid the fee to DeGeurin.

The district court, struggling with a difficult issue in a short period of time, may be forgiven its error in interpreting and applying *Jones.* Information concerning who paid Reyes–Requena's fee to DeGeurin and the amount, method or terms of payment is not exempted from disclosure by the attorney-client privilege.

### B. Rule 17(c) Supervisory Power

The district court may quash or modify a grand jury's subpoena if it is found to be unreasonable or oppressive. Fed.R.Crim.P. 17(c). Few cases are akin to this one in quashing a subpoena because of its timing—because it forced a criminal attorney to interrupt his representation of his client at the critical post-detention/pre-indictment phase of the case.[13] *See In re Grand Jury Matters,* 751 F.2d 13, 16 (1st Cir.1984).

■■■ The decision to quash a grand jury subpoena must be undertaken carefully:

> Any holding that would saddle a grand jury with minitrials and preliminary showings would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious admin-

istration of the criminal laws. The grand jury may not always serve its historic role as a protective bulwark standing solidly between the ordinary citizen and an overzealous prosecutor, but if it is even to approach the proper performance of its constitutional mission, it must be free to pursue its investigations unhindered by external influence or supervision so long as it does not trench upon the legitimate rights of any witness called before it.

*United States v. Dionisio,* 410 U.S. 1, 17–18, 93 S.Ct. 764, 773–74, 35 L.Ed.2d 67 (1973) (citations and footnote omitted). Attorneys "are not exempted from this duty to appear" before the grand jury. *In re Grand Jury Subpoena Served upon Doe,* 781 F.2d 238, 249 (2d Cir.) (en banc) *cert. denied sub nom. Roe v. United States,* 475 U.S. 1108, 106 S.Ct. 1515, 89 L.Ed.2d 914 (1986). "There can be no absolute rule that frees an attorney, merely because he is such, to refuse to give unprivileged evidence to a grand jury." *In re Grand Jury Matters, supra,* 751 F.2d at 19.[14] The grand jury's right to obtain every man's evidence is substantively limited only by express constitutional, common law, or statutory privileges. *Branzburg v. Hayes,* 408 U.S. 665, 688, 92 S.Ct. 2646, 2660, 33 L.Ed.2d 626 (1972).

■■■ As we have seen, DeGeurin may not invoke the attorney-client privilege here. As will be seen, the Sixth Amendment privilege he claimed for Reyes–Requena rested on speculation *apart from* the matter of the subpoena's timing. The Second Circuit described the district court's supervisory role as follows:

> With respect to Colombo's constitutional claims in the post-indictment context, the Sixth Amendment assures him the right to be free of unduly burdensome

---

12. The pleadings may leave open the possibility that the information could be used against Reyes–Requena at his sentencing. We refuse to speculate on this possibility, which could be addressed by the Sentencing Guidelines and Fed.R.Crim.P. 32.

13. It is not contested that, apart from DeGeurin's privilege claims, the evidence sought by the

grand jury was relevant and specific and not subject to Rule 17(c) challenge to that extent.

14. Where no Sixth Amendment right to counsel has attached and the information sought by a grand jury is not within the attorney-client privilege, no motion to quash should be granted. *Doe, supra,* 781 F.2d 243–50.

interruption of his counsel's trial preparation and protects him from any unnecessary or arbitrary disqualification of his counsel. Assessment of whether the subpoena is unreasonable or burdensome, especially when sought to be enforced against counsel for an indicted defendant, can be determined under the standards of Rule 17(c), informed by Sixth Amendment considerations. The risk of disqualification should remain for determination at an *in limine* hearing by the trial judge who must weigh the probative value of the information the government seeks against the loss of counsel of the accused's choice.

*Doe, supra,* 781 F.2d at 250. Although this statement focuses on a possible disqualification of defense counsel, its considerations are germane to a claim that the timing of the subpoena is unreasonable or oppressive.

In this case, the district court's exercise of its discretion to quash the subpoena because it created a serious interference with Reyes–Requena's relationship with his attorney is justified for several reasons. Reyes–Requena's Sixth Amendment rights had attached. The prosecution against him was moving swiftly—an indictment issued within three weeks of Reyes–Requena's detention hearing. DeGeurin's representation of Reyes–Requena was effectively stalled during the two-to-three-week interval that he contested the subpoena. The government made no effort to explain, even rhetorically, why it was necessary to subpoena DeGeurin during that critical juncture in his representation of the defendant. The government made not a single argument in the district court or before this court to suggest that a brief delay in the process, until a lull in the Reyes–Requena prosecution or until after his conviction, would have been imprudent.[15] Thus, when the district court quashed the subpoena to DeGeurin, solely because of its oppressive timing, we do not believe that the court abused its discretion. Alternatively,

the court could have modified the subpoena, continuing it to a future date that would not have interfered so starkly with DeGeurin's representation of his client. As the government did not suggest a modification, the district court can be excused for not exercising its discretion to grant one.

The government would distinguish the only appellate case that has affirmed a district court's decision to quash a grand jury subpoena issued against defense attorneys who were preparing for trial, namely, *In re Grand Jury Matters, supra,* 751 F.2d 13. According to the government, that case turned on a finding that the subpoena was issued for "harassment," and the case has been limited by later First Circuit authority. *See In re Grand Jury Proceedings (Wilson),* 760 F.2d 26 (1st Cir. 1985). We disagree with the government. The earlier case that quashed the subpoena does not confine its analysis to the sole circumstance of harassment. Moreover, the burden on DeGeurin of complying with the subpoena he received was, because of its timing, probably at least as oppressive as the combined effect of bad timing and harassment in *In re Grand Jury Matters.* The state court prosecution with which that subpoena interfered was delayed for months, while Reyes–Requena's prosecution moved swiftly notwithstanding the dispute over the subpoena. Second, the government makes too much of the later First Circuit case involving attorney Wilson. The court pointed out that Wilson asserted a completely untenable basis, as a former civil attorney for a client under investigation, for refusing to respond to the grand jury. In so doing, the court stated the general rule that courts should normally enforce grand jury subpoenas. *Wilson,* 760 F.2d at 27. That rule, with which we fully concur, does not conflict with the court's Rule 17(c) supervisory authority to modify or quash a subpoena whose timing may be oppressive or unreasonable. Each claim for relief must be

---

**15.** We do not imply that the government was required to justify its subpoena of DeGeurin substantively beyond the usual minimum requirements of relevance, specificity, and timeliness. The government could, however, have furnished some factual basis, if one existed, for the exigency of enforcing a subpoena at this particularly onerous time.

carefully and independently evaluated under Rule 17(c).

Amici curiae have proposed that its court exercise our "supervisory power" to promulgate detailed guidelines governing the enforcement of grand jury subpoenas against attorneys. This we decline to do. We are reluctant to interfere with the broad investigatory authority of the grand jury. Requests for general rules should be addressed to Congress or to the Judicial Conference of the United States. In any event, judicial attempts to regulate attorney appearances before the grand jury would tend to create exemptions beyond matters of privilege and constitutional limitations and would transgress the command of *Branzburg, supra.*

Despite our general sympathy with the district court's decision to quash the DeGeurin subpoena when it was issued, new circumstances have arisen in the wake of Reyes–Requena's conviction. DeGeurin cannot claim that his client's Sixth Amendment interest remains at the same high level as when the subpoena was originally quashed. *See In re Grand Jury Subpoenas (Anderson),* 906 F.2d 1485, 1495 (10th Cir.1990). Although we could sustain the motion to quash based upon events as they stood nearly a year ago—leaving the government to issue a new subpoena to DeGeurin in the short time remaining until the grand jury's term expires—to do so would foster needless delay. Because this basis for the district court's action has vanished, it furnishes no support for a refusal to enforce the subpoena at this time. *Cf. Doe, supra,* 781 F.2d at 251 (finding record before appellate court sufficiently comprehensive to evaluate Rule 17(c) claim rather than cause further delay by remanding issue to district court).

## C. Sixth Amendment

■ The district court also referred to the Sixth Amendment itself as a ground for quashing the subpoena. The court worried that the subpoena to DeGeurin "under the circumstances presented here threatens the integrity of the adversarial process." The court also saw a "strong possibility that enforcement of a government-issued subpoena to [Reyes–Requena's] attorney will cause counsel's disqualification during the pendency of proceedings." Neither of these reasons supports quashing the subpoena.

We note first that the Sixth Amendment rationale has become moot with the passage of time. At the present, post-conviction stage of the proceedings against defendant Reyes–Requena, the possibility of disqualification can be described as insignificant. If such disqualification is what the district court saw as the threat to the integrity of the adversarial process, that threat no longer looms. Similarly, any threat that the subpoena would turn DeGeurin into a witness against his client Reyes–Requena did not materialize—and is unlikely to materialize now after trial and conviction.

If we consider DeGeurin's Sixth Amendment claims as of the time of the hearing to quash, the result is no different. As for disqualification, this possibility depends on unsupported speculation about the content of the sought-after testimony, the grand jury's response to it, and the government's subsequent use of it. DeGeurin argues that he *might* have become a witness to the facts to be presented in the government's case against Reyes–Requena. The government correctly points out that in order for a conflict to have arisen, a whole series of events would have to have taken place:

> The identity of the benefactor would have to incriminate Reyes–Requena. An indictment would have to be returned that reflected a conflict of interest. The theory of prosecution would have to give rise to irreconcilable differences. [DeGeurin] would have to be advised that he would be called as a government witness.

The courts of appeals have consistently "decline[d] to speculate that all those events will occur." *Doe, supra,* 781 F.2d at 245; *see also Anderson, supra,* 906 F.2d at 1494–95; *Tornay v. United States,* 840 F.2d 1424, 1439–40 (9th Cir.1988); *In re Klein,* 776 F.2d 628, 633 (7th Cir.1985).

The Tenth Circuit recently addressed the disqualification/conflict issue and conclud-

ed that "a subpoena served upon counsel during representation of a client ... should be quashed only upon a showing that the subpoena would create actual conflict between the attorney and client." *Anderson, supra,* 906 F.2d at 1494. In this case, the government specifically denied any intent to use the sought-after fee information against Reyes–Requena before the grand jury or at his trial. DeGeurin has offered us nothing more than his unsupported assertion that a conflict "would immediately arise." Thus, we must conclude that "[t]he record in this case is devoid of evidence that would establish an actual conflict between [DeGeurin] and [Reyes–Requena] even if the fee information were disclosed." *Id.*

This does not mean we are insensitive to concerns about unscrupulous attempts by the government to overcome the "presumption in favor of [a defendant's] counsel of choice" recognized by the Supreme Court in *Wheat v. United States,* 486 U.S. 153, 164, 108 S.Ct. 1692, 1700, 100 L.Ed.2d 140 (1988). Like the Second Circuit, however, "[w]e decline to adopt what amounts to a *per se* rule that testimony of an attorney before a grand jury as to benefactor payments inevitably will lead to disqualification of that attorney from representing his client." *Doe, supra,* 781 F.2d at 245. Only a showing of actual conflict, rather than mere speculative assertions, may overcome the concrete "obligation of every person to appear and give his evidence before the grand jury." *United States v. Dionisio,* 410 U.S. 1, 9–10, 93 S.Ct. 764, 769, 35 L.Ed.2d 67 (1973).

■ As for "the integrity of the adversary process," we think that district courts can better address the underlying concerns by reference to Rule 17(c) rather than the Sixth Amendment. In certain cases, a subpoena issued to an attorney after adversary proceedings have begun against his client but before the close of trial may interfere with the attorney's representation of his client. To the extent that such interference is "unreasonable or oppressive," the court may modify the timing of compliance according to the standards enunciated

previously in our opinion. Both the First Circuit and the Second Circuit have adopted this approach to Sixth Amendment claims not involving conflicts. *See In re Grand Jury Matters, supra,* 751 F.2d at 18–19; *Doe, supra,* 781 F.2d at 250.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the district court was REVERSED, and the cause was REMANDED for further proceedings consistent herewith.