## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

————

No. 19-50506

————

United States Court of Appeals
Fifth Circuit

**FILED**
April 24, 2020

Lyle W. Cayce
Clerk

TAYLOR LOHMEYER LAW FIRM P.L.L.C.,

      Plaintiff - Appellant

v.

UNITED STATES OF AMERICA,

      Defendant - Appellee

————

Appeal from the United States District Court
for the Western District of Texas

————

Before BARKSDALE, HIGGINSON, and DUNCAN, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

At issue is whether the district court erred by granting the Government's counter petition to enforce a summons issued to Taylor Lohmeyer Law Firm P.L.L.C. (Firm), notwithstanding the Firm's blanket claim that all documents responsive to the summons are protected by the attorney-client privilege. AFFIRMED.

I.

The Firm, located in Kerrville, Texas, provides estate- and tax-planning advice to its clients. In October 2018, the Internal Revenue Service (IRS) served a John Doe summons on the Firm, seeking documents for "John Does", U.S. taxpayers,

No. 19-50506

who, at any time during the years ended December 31, 1995[,] through December 31, 2017, used the services of [the Firm] . . . to acquire, establish, maintain, operate, or control (1) any foreign financial account or other asset; (2) any foreign corporation, company, trust, foundation or other legal entity; or (3) any foreign or domestic financial account or other asset in the name of such foreign entity.

A John Doe summons is "[a]ny summons described in [26 U.S.C. § 7609(c)(1) (covered summonses)] which does not identify the person with respect to whose liability the summons is issued". 26 U.S.C. § 7609(f) (Internal Revenue Code's special procedures for John Doe summonses). Issuing a John Doe summons first requires an *ex parte* court proceeding, in which the Government establishes: "(1) the summons relates to the investigation of a particular person or ascertainable group or class of persons"; "(2) there is a reasonable basis for believing that such person or group or class of persons may fail or may have failed to comply with any provision of any internal revenue law"; and "(3) the information sought to be obtained from the examination of the records or testimony (and the identity of the person or persons with respect to whose liability the summons is issued) is not readily available from other sources". *Id.*; *see also id.* § 7609(h)(2) (requiring the proceeding be *ex parte*). The Government successfully made this showing at an October 2018 hearing, prior to issuing the summons to the Firm.

The Government sought documents from the Firm based on the 2018 declaration of IRS Agent Russell-Hendrick, "an Offshore Special Matters Expert in the [IRS'] Special Enforcement Program", which "identifies and examines [U.S.] taxpayers involved in abusive transactions and other financial arrangements for the purpose of avoiding U.S. taxes". Agent Russell-Hendrick has submitted two supporting declarations for the Government in this case: the above-described declaration in 2018, prior to the *ex parte* proceeding; and

the other in 2019, attached to the Government's counter petition. The following is from the Agent's 2019 declaration.

The Government "is conducting an investigation to determine the identity and correct federal income tax liability of U.S. taxpayers for whom [the Firm] acquired or formed any foreign entity, opened or maintained any foreign financial account, or assisted in the conduct of any foreign financial transaction". The investigation arose because, during the IRS' audit of one U.S. taxpayer (Taxpayer-1), its investigation "revealed that Taxpayer-1 hired [the Firm] for tax planning, which [the Firm] accomplished by (1) establishing foreign accounts and entities, and (2) executing subsequent transactions relating to said foreign accounts and entities". Additionally, "[f]rom 1995 to 2009, Taxpayer-1 engaged [the Firm] to form 8 offshore entities in the Isle of Man and in the British Virgin Islands" and "established at least 5 offshore accounts so [Taxpayer-1] could assign income to them and, thus, avoid U.S. income tax on the earnings". "In June 2017, [however,] Taxpayer-1 and his wife executed a closing agreement with the IRS in which they admitted that Taxpayer-1 . . . earned unreported income of over $5 million for the 1996 through 2000 tax years, resulting in an unpaid income tax liability of over $2 [m]illion."

"Ultimately, Taxpayer-1 paid almost $4 million to the IRS to resolve his unpaid federal tax, interest, and penalties for those tax years." Consequently, the John Doe summons at issue here

> seeks records that may reveal the identity and international activities of certain clients of [the Firm], from January 1, 1995, through December 31, 2017. This information may be relevant to the underlying IRS investigation into the identity and correct federal income tax liability of U.S. persons who employed [the Firm] to conceal unreported taxable income in foreign countries. In particular, the IRS is seeking information on U.S. taxpayers for whom [the Firm] created and maintained foreign bank accounts

3

No. 19-50506

and foreign entities that may not be properly disclosed on tax returns.

After receiving the Government's summons, the Firm filed in federal district court a petition to quash the summons on various grounds, asserting "the summons is overbroad and represents an unprecedented intrusion into the attorney-client relationship and is plainly abusive". Regarding attorney-client privilege, the Firm claimed that, despite the general rule a lawyer's clients' identities are not covered by the privilege, an exception to that rule exists whereby "a client's identity is protected by the attorney-client privilege if its disclosure would result in the disclosure of a confidential communication". Accordingly, the Firm asserted the exception applies here, rendering all documents requested in the summons protected by the privilege.

The Government responded by filing a motion to dismiss the petition to quash and a counter petition to enforce the summons. Although the Government contended the Firm's petition was "jurisdictionally deficient", which supported the petition's dismissal, it highlighted that the petition itself "indicate[d] an unwillingness to comply with the summons" and supported enforcing it. As relevant here, the Firm responded to the Government's motion and counter petition, and the Government filed a reply.

At an April 2019 status hearing to discuss the pending filings, the court, with the parties' agreement, proceeded directly with the Government's counter petition. The counter petition was granted on 15 May 2019, with the court's ruling, *inter alia*: "blanket assertions of privilege are disfavored, the Firm bears a heavy burden at this stage, and the Firm relies only on a narrowly defined exception to the general rule that identities are not privileged[; therefore,] the Firm does not carry its burden". Moreover, the court noted in its order that, "if [the Firm] wishes to assert any claims of privilege as to any responsive documents, it may . . . do so, provided that any such claim of

4

privilege is supported by a privilege log which details the foundation for each claim on a document-by-document basis". Finally, the court stated it would "retain jurisdiction in th[e] case pending any challenges by the Government of the Firm's privilege log, should the Firm produce one".

## II.

In challenging the court's ruling, the Firm presents only its contentions as to attorney-client privilege. The district court, upon the Firm's motion, has stayed its proceedings pending this appeal. In doing so, the court stated: "The Firm produced no privilege log, so there is no longer a need for this Court to retain jurisdiction. Accordingly, the Clerk's office is directed to CLOSE this case".

"[A] district court order enforcing an IRS summons is an appealable final order". *Church of Scientology v. United States*, 506 U.S. 9, 18 n.11 (1992) (citation omitted). The party challenging the summons may do so "on any appropriate ground", including because the information sought "is protected by the attorney-client privilege". *Reisman v. Caplin*, 375 U.S. 440, 449 (1964) (citation omitted).

But "[r]eview of a district court's determination with respect to the attorney-client privilege, even on direct appeal, . . . is limited". *In re Avantel, S.A.*, 343 F.3d 311, 318 (5th Cir. 2003). "The application of the attorney-client privilege is a question of fact, to be determined in the light of the purpose of the privilege and guided by judicial precedents." *EEOC v. BDO USA, L.L.P.*, 876 F.3d 690, 695 (5th Cir. 2017) (internal quotation marks and citations omitted). "In evaluating a claim of attorney-client privilege, [our court] review[s] factual findings for clear error and the application of the controlling law *de novo*." *In re Itron, Inc.*, 883 F.3d 553, 557 (5th Cir. 2018) (italics added) (internal quotation marks and citation omitted).

No. 19-50506

In this instance, of course, federal privilege-law applies. *See, e.g.*, *Avantel*, 343 F.3d at 323 (citation omitted). In that regard, for the attorney-client privilege to protect from disclosure, either in whole or in part, a document responsive to the Government's summons in this case, the Firm must establish that the document contains a confidential communication, between it and a client, made with the client's "primary purpose" having been "securing either a legal opinion or legal services, or assistance in some legal proceeding". *BDO USA*, 876 F.3d at 695 (citation omitted). "Because the attorney-client privilege has the effect of withholding relevant information from the fact-finder, it is interpreted narrowly so as to apply only where necessary to achieve its purpose." *Id.* (alteration, internal quotation marks, and citation omitted). Construing the privilege narrowly is particularly important with IRS investigations because of the "congressional policy choice *in favor of disclosure* of all information relevant to a legitimate IRS inquiry". *United States v. Arthur Young & Co.*, 465 U.S. 805, 816–17 (1984) (emphasis in original) (citations omitted).

As discussed in part, "[d]etermining the applicability of the privilege is a highly fact-specific inquiry, and the party asserting the privilege bears the burden of proof". *BDO USA*, 876 F.3d at 695 (internal quotation marks and citations omitted). In that regard, "[a]mbiguities as to whether the elements of a privilege claim have been met are construed against the proponent". *Id.* (citation omitted). Additionally, as a general rule, "the attorney-client privilege may not be tossed as a blanket over an undifferentiated group of documents". *United States v. El Paso Co.*, 682 F.2d 530, 539 (5th Cir. 1982) (citations omitted). Instead, "[t]he privilege must [generally] be specifically asserted with respect to particular documents". *Id.*; *see also United States v. Davis*, 636 F.2d 1028, 1038–39 (5th Cir. 1981) ("It is generally agreed that the recipient of a summons properly should appear before the issuing agent and

6

claim privileges on a question-by-question and document-by-document basis." (citations omitted)).

Moreover, "[a]s [another] general rule, client identit[ies] and fee arrangements are not protected as privileged". *In re Grand Jury Subpoena for Attorney Representing Criminal Defendant Reyes-Requena*, 926 F.2d 1423, 1431 (5th Cir. 1991) (*Reyes-Requena II*) (citation omitted).  That said, a "narrow exception" exists "when revealing the identity of the client and fee arrangements would itself reveal a confidential communication".  *Id.* (citation omitted).  This "limited and rarely available sanctuary, which by virtue of its very nature must be considered on a case-to-case basis", recognizes that "[u]nder certain circumstances, an attorney must conceal even the identity of a client, not merely his communications, from inquiry".  *United States v. Jones (In re Grand Jury Proceedings)*, 517 F.2d 666, 671 (5th Cir. 1975) (citation omitted).

The exception, however, does not expand the scope of the privilege; it does not apply "*independent of* the privileged communications between an attorney and his client".  *In re Grand Jury Subpoena for Attorney Representing Criminal Defendant Reyes-Requena*, 913 F.2d 1118, 1124 (5th Cir. 1990) (emphasis added).  Rather, a client's identity is shielded "only where revelation of such information would disclose other privileged communications such as the confidential motive for retention".  *Id.* at 1125 (citation omitted).  In that regard, the privilege "protect[s] the client's identity and fee arrangements in such circumstances not because they might be incriminating but because they are *connected inextricably* with a privileged communication—the confidential purpose for which [the client] sought legal advice".  *Reyes-Requena II*, 926 F.2d at 1431 (emphasis added).

Because the Firm contends this case falls within this exception to the general rule that a law firm's clients' identities are not protected by the

attorney-client privilege, it asserts: "[a]s a matter of law, all documents responsive to the summons are privileged"; and the district court erred in concluding otherwise. To support its position, the Firm relies on, *inter alia*, *Reyes-Requena II* and *United States v. Liebman*, 742 F.2d 807 (3d Cir. 1984).

As discussed, our court made clear in *Reyes-Requena II* that, "[i]f the disclosure of the client's identity will also reveal the confidential purpose for which he consulted an attorney, we protect both the confidential communication and the client's identity as privileged". *Reyes-Requena II*, 926 F.2d at 1431. And, as stated, "[w]e protect the client's identity and fee arrangements in such circumstances not because they might be incriminating but because they are connected inextricably with a privileged communication—the confidential purpose for which [the client] sought legal advice". *Id.* The Firm asserts such an inextricable connection is present here.

In *Liebman*, the third circuit, in applying the relevant exception to the general attorney-client privilege rule for client identities, determined:

> The affidavit of the IRS agent supporting the request for [a John Doe] summons not only identifies the subject matter of the attorney-client communication, but also describes its substance. That is, the affidavit does more than identify the communications as relating to the deductibility of legal fees paid to [the firm] in connection with the acquisition of a real estate partnership interest. It goes on to reveal the content of the communication, namely that "taxpayers . . . were advised by [the firm] that the fee was deductible for income tax purposes." Thus, this case falls within the situation where "so much of the actual communication had already been established, that to disclose the client's name would disclose the essence of a confidential communication . . . ."

*Liebman*, 742 F.2d at 809 (alterations added) (citations omitted). Along that line, the Firm contends: Agent Russell-Hendrick's 2018 declaration, like that of the IRS agent in *Liebman*, establishes the Government already knows the content of the legal advice the Firm provided the Does; and, if the Firm is

"required to identify [its] clients as requested, that identity, when combined with the substance of the communication . . . that is already known, would provide all there is to know about a confidential communication between the taxpayer-client and the attorney", breaching the attorney-client privilege. *See id.* at 810.

Both cases, however, are distinguishable. In *Reyes-Requena II*, which involved whether a defense attorney was required "to reveal the identity of an anonymous third[-]party benefactor who paid the attorney's fees for [a] drug defendant", both the district court and our court, unlike in this case, inspected sealed documents relevant to the privilege claim. *Reyes-Requena II*, 926 F.2d at 1425, 1428, 1432 (citations omitted). Moreover, the benefactor whose identity was at issue intervened in the case, and the district court determined, "[r]elying upon the sealed affidavits presented *in camera*", that: "an attorney/client privilege existed between [the defense attorney] and Intervenor . . . and . . . the relationship was ongoing"; "Intervenor retained [the defense attorney] to represent [the criminal defendant] and Intervenor *jointly* for a confidential purpose"; and "if [the defense attorney] were to reveal the Intervenor's identity, Intervenor's confidential motive for retaining [the defense attorney] would be exposed as apparent". *Id.* at 1428 (emphasis in original) (citations omitted). It was under these specific circumstances, not present here, that the district court found, and our court agreed, the intervening client's "confidential motive for consulting [the defense attorney] was intertwined inextricably with his identity and fee arrangements". *Id.* at 1431 (citation omitted).

In *Liebman*, the IRS agent's declaration explicitly identified taxpayers' communications "as relating to the deductibility of legal fees paid to [the firm] in connection with the acquisition of a real estate partnership interest" and that, as the defendant firm conceded, "taxpayers . . . were advised by [the firm]

that the fee was deductible for income tax purposes". *Liebman*, 742 F.2d at 809 (alteration in original) (citations omitted). The IRS contended the fee was not deductible, and the John Doe summons at issue in that case, therefore, sought identity information explicitly for the discrete subset of clients "who paid fees in connection with the acquisition of real estate partnership interests". *Id.* at 808 (citation omitted). "Because the IRS request was limited to the group of persons who paid for *specific* investment advice, the IRS would automatically identify those who were told they could make the questionable deductions", and this "would [have] provide[d] all there [was] to know about a confidential communication between the taxpayer-client and the attorney[,] . . . breach[ing] the attorney-client privilege to which that communication [was] entitled". *Id.* at 809–10 (emphasis added).

Importantly, however, and contrary to the Firm's contention, Agent Russell-Hendrick's 2018 declaration did *not* state the Government *knows* the substance of the legal advice the Firm provided the Does. (Nor, for that matter, does her 2019 declaration.) Rather, it outlined evidence providing a "reasonable basis", as required by 26 U.S.C. § 7609(f), "for concluding that the clients of [the Firm] are of interest to the [IRS] because of the [Firm's] services directed at concealing its clients' beneficial ownership of offshore assets". The 2018 declaration also made clear that "the IRS is pursuing an investigation to develop information about other unknown clients of [the Firm] *who may have* failed to comply with the internal revenue laws by availing themselves of similar services to those that [the Firm] provided to Taxpayer-1". (Emphasis added.) Therefore, unlike the declaration in *Liebman*, neither of the Agent's declarations in this case identified specific, substantive legal advice the IRS considered improper and then supported the Government's effort to receive the identities of clients who received that advice. *See Liebman*, 742 F.2d at 809.

10

Instead, the John Doe summons at issue seeks, *inter alia*: documents "reflecting *any* U.S. clients at whose request or on whose behalf [the Firm] ha[s] acquired or formed *any* foreign entity, opened or maintained *any* foreign financial account, or assisted in the conduct of *any* foreign financial transaction"; "[a]ll books, papers, records, or other data . . . concerning the provision of services to U.S. clients relating to setting up offshore financial accounts"; and "[a]ll books, papers, records, or other data . . . concerning the provision of services to U.S. clients relating to the acquisition, establishment or maintenance of offshore entities or structures of entities". (Emphasis added.)  As the Government asserted, this broad request, seeking relevant information about *any* U.S. client who engaged in *any one of a number* of the Firm's services, is not the same as the Government's knowing whether any Does engaged in allegedly fraudulent conduct, or the content of any specific legal advice the Firm gave particular Does, and then requesting their identities.

This is particularly true given statements made by Fred Lohmeyer, one of the Firm's name partners, in his declaration attached to the Firm's memorandum supporting its petition to quash the summons.  He stated the Firm's other clients "ha[ve] facts that are distinguishable from" those of Taxpayer-1 "because[,] to the best of [his] knowledge, [the Firm] never advised any other client with respect to the treatment of earned income as income earned by a foreign corporation".  This undermines the Firm's contention that the Government knows the substantive content of legal advice the Firm gave the Does.

In that regard, the circumstances here, as contended by the Government, are more like those in *United States v. BDO Seidman*, 337 F.3d 802 (7th Cir. 2003).  That case involved unnamed clients of a public accounting and consulting firm seeking to intervene in an IRS enforcement action against the

firm "to assert a confidentiality privilege regarding certain documents that [the firm] intended to produce in response to [IRS] summonses . . . because the[] documents reveal[ed] their identities as [firm] clients who sought advice regarding tax shelters and who subsequently invested in those shelters". *Id.* at 805–06. According to the clients, disclosing their identities "inevitably would violate the statutory privilege [26 U.S.C. § 7525] protecting confidential communications between a taxpayer and any federally authorized tax practitioner giving tax advice". *Id.* at 806 (citation omitted).

*BDO Seidman*, of course, does differ in some respects from this case. Namely, the clients sought to intervene in *BDO Seidman* (in which the IRS targeted the firm's, *not the clients'*, compliance with the Internal Revenue Code); and a statutory, not the attorney-client, privilege, was at issue. *See id.* at 805–06. Critically, however, the statutory privilege was modeled after the attorney-client privilege, including its rule that "ordinarily the identity of a client does not come within the scope of the privilege" and its "limited exception" allowing that "the identity of a client may be privileged in the rare circumstance when so much of an actual confidential communication has been disclosed already that merely identifying the client will effectively disclose that communication". *Id.* at 810–11 (citations omitted). Ultimately, the seventh circuit's rationale in analyzing the privilege claim on the facts of the case before it, and affirming the district court's denial of the clients' motions to intervene, is instructive: "[d]isclosure of the identities of the Does will disclose to the IRS that the Does participated in one of the 20 types of tax shelters described in its summonses"; but, "[i]t is less than clear . . . as to what motive, or other confidential communication of tax advice, can be inferred from that information alone". *See id.* at 812–13.

The same is true here: disclosure of the Does' identities would inform the IRS that the Does participated in at least one of the numerous transactions

No. 19-50506

described in the John Doe summons issued to the Firm, but "[i]t is less than clear . . . as to what motive, or other confidential communication of [legal] advice, can be inferred from that information alone". *See id.* at 812. Consequently, the Firm's clients' identities are not "connected inextricably with a privileged communication", and, therefore, the "narrow exception" to the general rule that client identities are not protected by the attorney-client privilege is inapplicable. *See Reyes Requena II*, 926 F.2d at 1431 (citations omitted).

## III.

For the foregoing reasons, the 15 May 2019 enforcement order is AFFIRMED.

13